Jane **PERLMAN** et al., Plaintiffs-Appellants,

v.

C. Russell **FELDMANN**, Newport Steel Corporation et al., Defendants-Appellees.

No. 9, Docket 22918.

United States Court of Appeals, Second Circuit.

Argued Oct. 5, 6, 1954.

Decided Jan. 26, 1955.

Eugene Eisenmann, New York City (Pomerantz, Levy & Haudek, Proskauer, Rose, Goetz & Mendelsohn, Nemerov & Shapiro, William Rosenfeld, Abraham L. Pomerantz, J. Alvin Van Bergh, and William E. Haudek, New York City, and A. Charles Lawrence and Alan J. Altheimer, Chicago, Ill., on the brief), for plaintiffs-appellants.

Arthur H. Dean, New York City (Sullivan & Cromwell, Howard T. Milman, Edward M. Harris, Jr., and Karl G. Harr, Jr., New York City, and Cummings & Lockwood and Raymond E. Hackett, Stamford, Conn., on the brief), for defendants-appellees C. Russell Feldmann et al.

William J. Harnisch, New York City (Manning, Harnisch, Hollinger & Shea, New York City, on the brief), for defendant-appellee Newport Steel Corp.

Before CLARK, Chief Judge, and SWAN and FRANK, Circuit Judges.

CLARK, Chief Judge.

This is a derivative action brought by minority stockholders of Newport Steel Corporation to compel accounting for, and restitution of, allegedly illegal gains which accrued to defendants as a result of the sale in August, 1950, of their controlling interest in the corporation. The principal defendant, C. Russell Feldmann, who represented and acted for the others, members of his family,[1] was at that time not only the dominant stockholder, but also the chairman of the board of directors and the president of the corporation. Newport, an Indiana

---

1. The stock was not held personally by Feldmann in his own name, but was held by the members of his family and by personal corporations. The aggregate of stock thus had amounted to 33% of the outstanding Newport stock and gave working control to the holder. The actual sale included 55,552 additional shares held by friends and associates of Feldmann, so that a total of 37% of the Newport stock was transferred.

corporation, operated mills for the production of steel sheets for sale to manufacturers of steel products, first at Newport, Kentucky, and later also at other places in Kentucky and Ohio. The buyers, a syndicate organized as Wilport Company, a Delaware corporation, consisted of end-users of steel who were interested in securing a source of supply in a market becoming ever tighter in the Korean War. Plaintiffs contend that the consideration paid for the stock included compensation for the sale of a corporate asset, a power held in trust for the corporation by Feldmann as its fiduciary. This power was the ability to control the allocation of the corporate product in a time of short supply, through control of the board of directors; and it was effectively transferred in this sale by having Feldmann procure the resignation of his own board and the election of Wilport's nominees immediately upon consummation of the sale.

The present action represents the consolidation of three pending stockholders' actions in which yet another stockholder has been permitted to intervene. Jurisdiction below was based upon the diverse citizenship of the parties. Plaintiffs argue here, as they did in the court below, that in the situation here disclosed the vendors must account to the non-participating minority stockholders for that share of their profit which is attributable to the sale of the corporate power. Judge Hincks denied the validity of the premise, holding that the rights involved in the sale were only those normally incident to the possession of a controlling block of shares, with which a dominant stockholder, in the absence of fraud or foreseeable looting, was entitled to deal according to his own best interests. Furthermore, he held that plaintiffs had failed to satisfy their burden of proving that the sales price was not a fair price for the stock per se. Plaintiffs appeal from these rulings of law which resulted in the dismissal of their complaint.

The essential facts found by the trial judge are not in dispute. Newport was a relative newcomer in the steel industry with predominantly old installations which were in the process of being supplemented by more modern facilities. Except in times of extreme shortage Newport was not in a position to compete profitably with other steel mills for customers not in its immediate geographical area. Wilport, the purchasing syndicate, consisted of geographically remote end-users of steel who were interested in buying more steel from Newport than they had been able to obtain during recent periods of tight supply. The price of $20 per share was found by Judge Hincks to be a fair one for a control block of stock, although the over-the-counter market price had not exceeded $12 and the book value per share was $17.03. But this finding was limited by Judge Hincks' statement that "[w]hat value the block would have had if shorn of its appurtenant power to control distribution of the corporate product, the evidence does not show." It was also conditioned by his earlier ruling that the burden was on plaintiffs to prove a lesser value for the stock.

██ Both as director and as dominant stockholder, Feldmann stood in a fiduciary relationship to the corporation and to the minority stockholders as beneficiaries thereof. Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281; Southern Pac. Co. v. Bogert, 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099. His fiduciary obligation must in the first instance be measured by the law of Indiana, the state of incorporation of Newport. Rogers v. Guaranty Trust Co. of New York, 288 U.S. 123, 136, 53 S.Ct. 295, 77 L.Ed. 652; Mayflower Hotel Stockholders Protective Committee v. Mayflower Hotel Corp., 89 U.S.App.D.C. 171, 193 F.2d 666, 668. Although there is no Indiana case directly in point, the most closely analogous one emphasizes the close scrutiny to which Indiana subjects the conduct of fiduciaries when personal benefit may stand in the way of fulfillment of trust obligations. In Schemmel v. Hill, 91 Ind.App. 373, 169 N.E. 678, 682, 683, McMahan, J., said:

"Directors of a business corporation act in a strictly fiduciary capacity. Their office is a trust. Stratis v. Andreson, 1926, 254 Mass. 536, 150 N.E. 832, 44 A. L.R. 567; Hill v. Nisbet, 1885, 100 Ind. 341, 353. When a director deals with his corporation, his acts will be closely scrutinized. Bossert v. Geis, 1914, 57 Ind.App. 384, 107 N.E. 95. Directors of a corporation are its agents, and they are governed by the rules of law applicable to other agents, and, as between themselves and their principal, the rules relating to honesty and fair dealing in the management of the affairs of their principal are applicable. They must not, in any degree, allow their official conduct to be swayed by their private interest, which must yield to official duty. Leader Publishing Co. v. Grant Trust Co., 1915, 182 Ind. 651, 108 N.E. 121. In a transaction between a director and his corporation, where he acts for himself and his principal at the same time in a matter connected with the relation between them, it is presumed, where he is thus potential on both sides of the contract, that self-interest will overcome his fidelity to his principal, to his own benefit and to his principal's hurt." And the judge added: "Absolute and most scrupulous good faith is the very essence of a director's obligation to his corporation. The first principal duty arising from his official relation is to act in all things of trust wholly for the benefit of his corporation."

In Indiana, then, as elsewhere, the responsibility of the fiduciary is not limited to a proper regard for the tangible balance sheet assets of the corporation, but includes the dedication of his uncorrupted business judgment for the sole benefit of the corporation, in any dealings which may adversely affect it. Young v. Higbee Co., 324 U.S. 204, 65 S.Ct. 594, 89 L.Ed. 890; Irving Trust Co. v. Deutsch, 2 Cir., 73 F.2d 121, certiorari denied 294 U.S. 708, 55 S.Ct. 405, 79 L.Ed. 1243; Seagrave Corp. v. Mount, 6 Cir., 212 F.2d 389; Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 62 A.L.R. 1; Commonwealth Title Ins.

& Trust Co. v. Seltzer, 227 Pa. 410, 76 A. 77. Although the Indiana case is particularly relevant to Feldmann as a director, the same rule should apply to his fiduciary duties as majority stockholder, for in that capacity he chooses and controls the directors, and thus is held to have assumed their liability. Pepper v. Litton, supra, 308 U.S. 295, 60 S.Ct. 238. This, therefore, is the standard to which Feldmann was by law required to conform in his activities here under scrutiny.

It is true, as defendants have been at pains to point out, that this is not the ordinary case of breach of fiduciary duty. We have here no fraud, no misuse of confidential information, no outright looting of a helpless corporation. But on the other hand, we do not find compliance with that high standard which we have just stated and which we and other courts have come to expect and demand of corporate fiduciaries. In the often-quoted words of Judge Cardozo: "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions." Meinhard v. Salmon, supra, 249 N.Y. 458, 464, 164 N.E. 545, 546, 62 A.L.R. 1. The actions of defendants in siphoning off for personal gain corporate advantages to be derived from a favorable market situation do not betoken the necessary undivided loyalty owed by the fiduciary to his principal.

The corporate opportunities of whose misappropriation the minority stockholders complain need not have been an absolute certainty in order to support this action against Feldmann.

If there was possibility of corporate gain, they are entitled to recover. In Young v. Higbee Co., supra, 324 U.S. 204, 65 S.Ct. 594, two stockholders appealing the confirmation of a plan of bankruptcy reorganization were held liable for profits received for the sale of their stock pending determination of the validity of the appeal. They were held accountable for the excess of the price of their stock over its normal price, even though there was no indication that the appeal could have succeeded on substantive grounds. And in Irving Trust Co. v. Deutsch, supra, 2 Cir., 73 F.2d 121, 124, an accounting was required of corporate directors who bought stock for themselves for corporate use, even though there was an affirmative showing that the corporation did not have the finances itself to acquire the stock. Judge Swan speaking for the court pointed out that "The defendants' argument, contrary to Wing v. Dillingham [5 Cir., 239 F. 54], that the equitable rule that fiduciaries should not be permitted to assume a position in which their individual interests might be in conflict with those of the corporation can have no application where the corporation is unable to undertake the venture, is not convincing. If directors are permitted to justify their conduct on such a theory, there will be a temptation to refrain from exerting their strongest efforts on behalf of the corporation since, if it does not meet the obligations, an opportunity of profit will be open to them personally."

This rationale is equally appropriate to a consideration of the benefits which Newport might have derived from the steel shortage. In the past Newport had used and profited by its market leverage by operation of what the industry had come to call the "Feldmann Plan." This consisted of securing interest-free advances from prospective purchasers of steel in return for firm commitments to them from future production. The funds thus acquired were used to finance improvements in existing plants and to acquire new installations. In the summer of 1950 Newport had been negotiating for cold-rolling facilities which it needed for a more fully integrated operation and a more marketable product, and Feldmann plan funds might well have been used toward this end.

■■ Further, as plaintiffs alternatively suggest, Newport might have used the period of short supply to build up patronage in the geographical area in which it could compete profitably even when steel was more abundant. Either of these opportunities was Newport's, to be used to its advantage only. Only if defendants had been able to negate completely any possibility of gain by Newport could they have prevailed. It is true that a trial court finding states: "Whether or not, in August, 1950, Newport's position was such that it could have entered into 'Feldmann Plan' type transactions to procure funds and financing for the further expansion and integration of its steel facilities and whether such expansion would have been desirable for Newport, the evidence does not show." This, however, cannot avail the defendants, who—contrary to the ruling below—had the burden of proof on this issue, since fiduciaries always have the burden of proof in establishing the fairness of their dealings with trust property. Pepper v. Litton, supra, 308 U.S. 295, 60 S.Ct. 238; Geddes v. Anaconda Copper Mining Co., 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425; Mayflower Hotel Stockholders Protective Committee v. Mayflower Hotel Corp., 84 U.S.App. D.C. 275, 173 F.2d 416.

Defendants seek to categorize the corporate opportunities which might have accrued to Newport as too unethical to warrant further consideration. It is true that reputable steel producers were not participating in the gray market brought about by the Korean War and were refraining from advancing their prices, although to do so would not have been illegal. But Feldmann plan transactions were not considered within this self-imposed interdiction; the trial court found that around the time of the Feldmann sale Jones & Laughlin Steel Cor-

poration, Republic Steel Company, and Pittsburgh Steel Corporation were all participating in such arrangements. In any event, it ill becomes the defendants to disparage as unethical the market advantages from which they themselves reaped rich benefits.

We do not mean to suggest that a majority stockholder cannot dispose of his controlling block of stock to outsiders without having to account to his corporation for profits or even never do this with impunity when the buyer is an interested customer, actual or potential, for the corporation's product. But when the sale necessarily results in a sacrifice of this element of corporate good will and consequent unusual profit to the fiduciary who has caused the sacrifice, he should account for his gains. So in a time of market shortage, where a call on a corporation's product commands an unusually large premium, in one form or another, we think it sound law that a fiduciary may not appropriate to himself the value of this premium. Such personal gain at the expense of his co-venturers seems particularly reprehensible when made by the trusted president and director of his company. In this case the violation of duty seems to be all the clearer because of this triple role in which Feldmann appears, though we are unwilling to say, and are not to be understood as saying, that we should accept a lesser obligation for any one of his roles alone.

Hence to the extent that the price received by Feldmann and his co-defendants included such a bonus, he is accountable to the minority stockholders who sue here. Restatement, Restitution §§ 190, 197 (1937); Seagrave Corp. v. Mount, supra, 6 Cir., 212 F.2d 389. And plaintiffs, as they contend, are entitled to a recovery in their own right, instead of in right of the corporation (as in the usual derivative actions), since neither Wilport nor their successors in interest should share in any judgment which may be rendered. See Southern Pacific Co. v. Bogert, 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099. Defendants cannot well object to this form of recovery, since the only alternative, recovery for the corporation as a whole, would subject them to a greater total liability.

The case will therefore be remanded to the district court for a determination of the question expressly left open below, namely, the value of defendants' stock without the appurtenant control over the corporation's output of steel. We reiterate that on this issue, as on all others relating to a breach of fiduciary duty, the burden of proof must rest on the defendants. Bigelow v. RKO Radio Pictures, 327 U.S. 251, 265–266, 66 S.Ct. 574, 90 L.Ed. 652; Package Closure Corp. v. Sealright Co., 2 Cir., 141 F.2d 972, 979. Judgment should go to these plaintiffs and those whom they represent for any premium value so shown to the extent of their respective stock interests.

The judgment is therefore reversed and the action remanded for further proceedings pursuant to this opinion.

SWAN, Circuit Judge (dissenting).

With the general principles enunciated in the majority opinion as to the duties of fiduciaries I am, of course, in thorough accord. But, as Mr. Justice Frankfurter stated in Securities and Exchange Comm. v. Chenery Corp., 318 U.S. 80, 85, 63 S.Ct. 454, 458, 87 L.Ed. 626, "to say that a man is a fiduciary only begins analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as a fiduciary? In what respect has he failed to discharge these obligations?" My brothers' opinion does not specify precisely what fiduciary duty Feldmann is held to have violated or whether it was a duty imposed upon him as the dominant stockholder or as a director of Newport. Without such specification I think that both the legal profession and the business world will find the decision confusing and will be unable to foretell the extent of its impact upon customary practices in the sale of stock.

The power to control the management of a corporation, that is, to elect direc-

tors to manage its affairs, is an inseparable incident to the ownership of a majority of its stock, or sometimes, as in the present instance, to the ownership of enough shares, less than a majority, to control an election. Concededly a majority or dominant shareholder is ordinarily privileged to sell his stock at the best price obtainable from the purchaser. In so doing he acts on his own behalf, not as an agent of the corporation. If he knows or has reason to believe that the purchaser intends to exercise to the detriment of the corporation the power of management acquired by the purchase, such knowledge or reasonable suspicion will terminate the dominant shareholder's privilege to sell and will create a duty not to transfer the power of management to such purchaser. The duty seems to me to resemble the obligation which everyone is under not to assist another to commit a tort rather than the obligation of a fiduciary. But whatever the nature of the duty, a violation of it will subject the violator to liability for damages sustained by the corporation. Judge Hincks found that Feldmann had no reason to think that Wilport would use the power of management it would acquire by the purchase to injure Newport, and that there was no proof that it ever was so used. Feldmann did know, it is true, that the reason Wilport wanted the stock was to put in a board of directors who would be likely to permit Wilport's members to purchase more of Newport's steel than they might otherwise be able to get. But there is nothing illegal in a dominant shareholder purchasing from his own corporation at the same prices it offers to other customers. That is what the members of Wilport did, and there is no proof that Newport suffered any detriment therefrom.

My brothers say that "the consideration paid for the stock included compensation for the sale of a corporate asset", which they describe as "the ability to control the allocation of the corporate product in a time of short supply, through control of the board of directors; and it was effectively transferred in this sale by having Feldmann procure the resignation of his own board and the election of Wilport's nominees immediately upon consummation of the sale." The implications of this are not clear to me. If it means that when market conditions are such as to induce users of a corporation's product to wish to buy a controlling block of stock in order to be able to purchase part of the corporation's output at the same mill list prices as are offered to other customers, the dominant stockholder is under a fiduciary duty not to sell his stock, I cannot agree. For reasons already stated, in my opinion Feldmann was not proved to be under any fiduciary duty as a stockholder not to sell the stock he controlled.

Feldmann was also a director of Newport. Perhaps the quoted statement means that as a director he violated his fiduciary duty in voting to elect Wilport's nominees to fill the vacancies created by the resignations of the former directors of Newport. As a director Feldmann was under a fiduciary duty to use an honest judgment in acting on the corporation's behalf. A director is privileged to resign, but so long as he remains a director he must be faithful to his fiduciary duties and must not make a personal gain from performing them. Consequently, if the price paid for Feldmann's stock included a payment for voting to elect the new directors, he must account to the corporation for such payment, even though he honestly believed that the men he voted to elect were well qualified to serve as directors. He can not take pay for performing his fiduciary duty. There is no suggestion that he did do so, unless the price paid for his stock was more than its value. So it seems to me that decision must turn on whether finding 120 and conclusion 5 of the district judge are supportable on the evidence. They are set out in the margin.[1]

---

1. "120. The 398,927 shares of Newport stock sold to Wilport as of August 31, 1950, had a fair value as a control block of $20 per share. What value the block

Judge Hincks went into the matter of valuation of the stock with his customary care and thoroughness. He made no error of law in applying the principles relating to valuation of stock. Concededly a controlling block of stock has greater sale value than a small lot. While the spread between $10 per share for small lots and $20 per share for the controlling block seems rather extraordinarily wide, the $20 valuation was supported by the expert testimony of Dr. Badger, whom the district judge said he could not find to be wrong. I see no justification for upsetting the valuation as clearly erroneous. Nor can I agree with my brothers that the $20 valuation "was limited" by the last sentence in finding 120. The controlling block could not by any possibility be shorn of its appurtenant power to elect directors and through them to control distribution of the corporate product. It is this "appurtenant power" which gives a controlling block its value as such block. What evidence could be adduced to show the value of the block "if shorn" of such appurtenant power, I cannot conceive, for it cannot be shorn of it.

The opinion also asserts that the burden of proving a lesser value than $20 per share was not upon the plaintiffs but the burden was upon the defendants to prove that the stock was worth that value. Assuming that this might be true as to the defendants who were directors of Newport, they did show it, unless finding 120 be set aside. Furthermore, not all the defendants were directors; upon what theory the plaintiffs should be relieved from the burden of proof as to defendants who were not directors, the opinion does not explain.

The final conclusion of my brothers is that the plaintiffs are entitled to recover in their own right instead of in the right of the corporation. This appears to be completely inconsistent with the theory advanced at the outset of the opinion, namely, that the price of the stock "included compensation for the sale of a corporate asset." If a corporate asset was sold, surely the corporation should recover the compensation received for it by the defendants. Moreover, if the plaintiffs were suing in their own right, Newport was not a proper party. The case of Southern Pacific Co. v. Bogert, 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099, relied upon as authority for the conclusion that the plaintiffs are entitled to recover in their own right, relates to a situation so different that the decision appears to me to be inapposite.

I would affirm the judgment on appeal.

---

would have had if shorn of its appurtenant power to control distribution of the corporate product, the evidence does not show."

"5. Even if Feldmann's conduct in cooperating to accomplish a transfer of control to Wilport immediately upon the sale constituted a breach of a fiduciary duty to Newport, no part of the moneys received by the defendants in connection with the sale constituted profits for which they were accountable to Newport."