[Civ. No. 25528.   First Dist., Div. Three.   Mar. 28, 1969.]

HARRINGTON BROWN, JR., et al., Plaintiffs and Appellants, v. VENA HALBERT, Individually and as Administratrix, etc., et al., Defendants and Respondents.

Thomas, Snell, Jamison, Russell, Williamson & Asperger, William N. Snell and Michael A. Willemsen for Plaintiffs and Appellants.

Berryhill & Kuney, Kenneth A. Kuney, Richard W. Nichols, McCutchen, Doyle, Brown & Enersen, Morris M. Doyle, Arthur R. Albrecht and David M. Balabanian for Defendants and Respondents.

BROWN (H. C.), J.—This action was instituted by four minority stockholders in the Tulare Savings & Loan Association (hereafter Association), individually and on behalf of all other minority stockholders similarly situated. The purpose of the first cause of action was to impose a trust on a portion of the funds the defendants[1] realized as a result of a sale of their majority stock interest allegedly in violation of their fiduciary obligations to the minority stockholders. The second cause of action was for damages for breach of the fiduciary obligation of defendants in the sale which rendered the stock of the minority stockholders less valuable.

The principal defendant was Edward F. Halbert,[2] who was the dominant stockholder (Mr. Halbert and his wife owned 53 percent of the 1,000 shares issued) and also was the president, chairman of the board of directors and manager of the Association.

---

[1]Although the complaint named four defendants, Edward F. Halbert, his wife, Vena Halbert; Roland Morris and Robert Tienken, only Edward F. Halbert was claimed as the principal violator of fiduciary duties. The three other defendants are charged with accountability for their acquiescence in his actions and by reason of their acceptance of the benefits.

[2]Edward F. Halbert died before the suit was filed and Vena Halbert, his wife and administratrix of his estate, was named as the defendant in his place.

The facts presented to the trial court posed the problems: (1) whether the defendant Halbert, as dominant stockholder, president of the Association and chairman of the board of directors, occupied a fiduciary relationship to the stockholders; and (2) whether he violated such relationship by the manner of selling a controlling block of stock to outside purchasers at a price not made available to the minority group of shareholders.

The trial court at the conclusion of plaintiffs' submission of evidence dismissed the second cause of action as to the plaintiffs who had not sold their stock and as to those plaintiffs who did not appear either in person or by attorneys. The case was thereafter submitted to the jury who returned a verdict (advisory) recommending that a constructive trust not be imposed and also a verdict under the second cause of action that damages should not be awarded to plaintiffs (hereafter referred to as appellants) for the alleged breach of fiduciary obligations by defendants (hereafter referred to as respondents).

The appellants claim that the trial court erred (1) in permitting the jury to determine whether or not Halbert occupied a fiduciary relationship when they should have been instructed that as dominant shareholder, president of the Association and chairman of the board of directors he was a fiduciary; (2) that there were other errors in the instructions relating to the burden of proof and in the instructions on the "special fact doctrine"; and (3) that the evidence does not support the findings or judgment.

At the outset, it must be noted that the verdict of the jury was only advisory on the equitable issues. We note that 114 instructions were given to the jury, to some of which we will hereafter refer. Appellants' contentions directed to erroneous instructions need not take our major attention. Their significance lies chiefly in that they reflect the reasoning by which the trial court concluded there was no liability on the first cause of action. Rather, we here concern ourselves with the findings made *by the court* in respect to the existence or non-existence of the fiduciary relationship, upon the evidence before it.

The facts: The Association is a savings and loan association in the City of Tulare. (The only other savings and loan association in Tulare is nationally chartered.) In January of 1963 its authorized issue of 1,000 shares of capital stock was owned by some 24 persons (joint owners not separately counted). Prior to May 15, 1963, Edward F. Halbert indi-

vidually owned 262 shares of stock of the Association. Prior to May 15, 1963, Vena Halbert individually owned 262 shares of stock in the Association. Prior to May 15, 1963, Edward F. Halbert and Vena Halbert together owned 6 shares of stock of the Association.[3] Up to May 31, 1963, Edward Halbert was president of the Association, Nels Christensen was vice-president, Roland Morris was secretary-treasurer and Vena Halbert was assistant secretary-treasurer. Mr. Halbert was the chairman of the board of directors and manager of the corporation; other directors were Christensen, Morris H. Brown and W. O. Willeford. The Halberts were each paid $500 per month as salary. Morris was second in command of the operation of the Association and also was a salaried employee.

In November of 1962 a Mr. Douglas McDonald, president of Lincoln Savings & Loan Association of Los Angeles, and his assistant, David Prince, called on Mr. Halbert at the Association's business office in Tulare. *Mr. McDonald asked Mr. Halbert if the Association was for sale. Halbert stated, " 'No, the Association is not for sale. However my wife and I would entertain selling our stock,' " and stated a price of two and one-half times book value. There was no evidence produced that the board of directors or stockholders had been consulted as to whether the company was for sale.* Other meetings were had between McDonald and Halbert and on January 14, 1963, McDonald by phone offered to purchase the Halberts' stock for his asking price of two and one-half times book value. That evening the Halberts received a $20,000 deposit and signed a contract for the sale of their stock. This agreement provided that the Association had issued 1,000 shares of guaranty stock and the Halberts owned a majority (53 percent). The agreed purchase price was $1,548.05 per share. *The right was given to purchasers to inspect the books.* An escrow was to be opened and the closing date was May 15, 1963. The sellers (Halberts) agreed " 'That upon the close of this escrow they will submit such resignations as officers and directors . . . as may be requested *by the Buyer and will hold such director and/or stockholders' meetings as may be requested by buyer for the purpose of electing new officers and directors of said association.''* (Italics added.) It was agreed

---

[3]Mrs. Vena Halbert was an employee of the Association since 1934. Mr. Edward Halbert became an employee in 1940 or 1941. Each separately owned his or her stock as separate property.

*that no dividends were to be paid.* The minority stockholders were not informed of the terms of the sale until after it had been negotiated, although it was generally rumored that Halbert wanted to sell his stock.

After the execution of the agreement, McDonald decided he would retain Morris as the manager of the Association and would buy his stock and that owned by a Robert Tienken. These purchases were consummated at the same price paid the Halberts, $1,548.05 per share.

Buyers thereafter, through their attorneys and accountants, made a thorough examination of the company's books and records. The authorization for this investigation was obtained from Mr. Halbert who also gave them copies of the examination by the Federal Home Loan Bank and the one by the State Savings and Loan Commissioner. Halbert adhered to the agreement and no dividends were paid. No request was made of the board of directors to obtain approval to permit buyers to inspect the Association's books and records. Likewise no authorization was obtained from the board to refrain from the payment of dividends. Prior to the sale the Association had paid the stockholders regular dividends.

During the two or three months of the escrow the Association suffered a loss of profits and of depositors' accounts. There is no evidence as to whether this was a normal seasonal loss or whether it was attributable to the activities of the sale.

Upon completion of the purchase of the Halberts' stock, the purchasers evidenced their desire to buy the stock of the minority stockholders. They offered $300 per share. Mr. Halbert made no effort to encourage the buyers to pay the minority stockholders for their shares, a price equivalent to the price he received. The evidence indicates that Mr. Halbert assisted the buyers in purchasing the minority stock. There was some testimony on behalf of the respondents that the outside buyers only desired to purchase the control block of stock. Their original action in making inquiry as to whether the Association was for sale and their subsequent activities in the solicitation of the minority stockholders for the purchase of all the stock (which they acquired shortly after gaining control of the Association) implied, however, that they at all times intended to acquire the minority stock as well as the Halberts' 53 percent of the stock.

After the close of the escrow but while he was still chairman of the board of directors and president, Halbert called on

Mr. McCourt, a minority stockholder, and informed him that he, Halbert, had sold his stock. McCourt said that he had heard rumors that no dividends would be paid. Halbert mentioned something about high salaries to the new owners and that it might be years before dividends would be paid. Halbert informed McCourt that the buyers were interested in buying his stock also. A meeting was arranged between McCourt and McDonald, who offered McCourt $300 for each share.

Halbert also drove the buyers to the ranch home of another stockholder, Harrington Brown, where the buyers also offered Brown $300 per share. The offers were not accepted. The buyers also told Brown *that they did not intend to pay dividends for a considerable number of years.*

Stockholder William Willeford, who had been director and stockholder for approximately 20 years, was told by Mr. Halbert that the new owners would not be paying dividends and the stock would not be worth much. Willeford also testified that the company lost money during the period the negotiations were going on and that there was a loss of deposits in the sum of $37,919. Halbert advised him that he should sell his stock and that the buyers would pay $300 per share. Willeford thereafter sold his stock because he did not think it would be of value unless dividends would be paid.

Halbert introduced the buyers to other stockholders who also were offered $300 per share for their stock. *To stockholder Christensen, Halbert advised that she should take the $300 as she might get nothing.*

A part of the statement of Mr. Halbert to Mrs. Christensen is quoted as follows: ''. . . I don't give a damn whether you or anybody else ever gets a penny of ours or not, in fact, I am going over to the Building and Loan and tell them—and see to it that you don't get a chance to sell your stock or get a penny out of it.''

At a special directors meeting called by Mr. Halbert, Mr. McDonald, his associate, Mr. Prince, and their attorney, Mr. Steelman, were introduced. Mr. Steelman stated: ''This isn't a short term operation as far as we are concerned. Now we are happy to have any minority stockholders go along with us for the ride if they understand clearly, it would be our idea, I know I am expressing your opinion, *that is one reason we'd prefer not to have any more dividends on the Guarantee stock because we like to draw it in, increase the assets of the association, and in time maybe ten or twenty years from now* . . .

If you want to get out and don't want to go along, I think a figure at three hundred dollars isn't something to sneer at . . .'' (Italics added.)

After the offer was made to the minority stockholders for $300 per share, the purchasers proceeded to take over control of the corporation. On May 31, 1963, the new stockholders met at the Association office with employees and proceeded to prepare the necessary notice for a stockholders meeting for the election of new directors and officers and to effectuate new policies. Stockholders Brown, Christensen and Willeford, learning of the meeting, appeared at the office and accepted a new offer of $611 per share for their stock and resigned as directors. Thereafter all but a few shares of stock of the minority stockholders was purchased for $611 to $650 per share.

The evidence produced at the trial relative to the market value of the stock owned by the Halberts and the other stockholders was conflicting.

The appellants' expert valuation witness Donna Hostetler was of the opinion that the most important factor in determining the value of the Association's stock was its book value and the Association's earnings. She believed that majority control stock would be evaluated slightly higher because it carried the right to elect directors and historically majority stock had a nuisance value in addition to its investment value. Mrs. Hostetler placed a value of 2½ times book value on savings and loan association stock that was sold on a stock exchange or ''over the counter'' and that small privately controlled companies when there were a limited number of sales that 1.75 times book value was a fair estimate. She set the fair market value of the majority stock at $1,154 per share and the minority at $944 per share.

The respondents' expert witness Kenet Pearce placed a market value of 2½ times book value, or $1,548.05 per share, for this block of majority control stock. Relative to the minority stock, he stated that his firm was not involved in small minority sales, but he believed that such minority stock would certainly be worth its book value. He failed to give any estimate for an increment above book value which would represent value of business good will or for the charter.

There was also evidence that the Association was in excellent financial condition. It had an original capitalization of $100,000 which is a desirable feature for a stockholder because any profits would be apportioned to fewer shares of stock. The

Association had a steady growth and had paid regular dividends over the years. Its loans were well secured, there being a minimum of scheduled items on its books (scheduled items are defined as poorly secured or high-risk loans). It was the only state-chartered savings and loan association in Tulare (the other association was nationally chartered). It had an almost exclusive franchise to do business in the Tulare area. The difficulty attendant with obtaining a charter from the State Savings and Loan Commissioner to open a new savings and loan association or for an established savings and loan association to obtain a permit to operate in a locality already serviced, is well known in the financial world. Book value was determined to be approximately $625 per share. (Book value is the net assets divided by the number of outstanding shares.) Book value here did not include any of the attributes of this Association, as hereinabove set forth, nor did it include an evaluation of the nature of its charter which gave it almost an exclusive right to do business in the area or for its good will.

There is but little dispute between the parties as to the facts. It is the application of the facts to existing legal principles that gives rise to the respective contentions of the parties.

Appellants specifically contend that respondent Halbert, in his triple fiduciary capacity, owed a duty to all the stockholders; that it existed when the majority stock was sold to an outsider, and that the duty was breached by the failure to act to secure a like advantage to the minority stockholders and in his other actions which aided the outside buyers and caused the minority stockholders to sell their stock at a devaluated price.

Appellants further contend that the court erred in instructing the jury that when a majority stockholder-director sells his stock to an outsider, he owes no duty to act in the interest of minority stockholders unless "special facts" exist which give rise to such duty and that the court also erred in other instructions bearing on the question of the burden of proof.

Respondents' position generally is that they merely sold their stock at the best price they could get for it and that they are not required to account to the other stockholders for any profit they realized.

Respondents' position is supported by the so-called majority rule found in the earlier cases. In *Ryder* v. *Bamberger*, 172 Cal. 791, 806 [158 P. 753], the court held: "[I]t is mani-

fest that, first, as stockholders the defendants had a perfect right to dispose of their stock . . . without the slightest regard to the wishes and desires or knowledge of the minority stockholders; . . .'' and also stated '' 'Though there is a conflict in the decisions as to the right of directors and officers to purchase the shares of other stockholders, it is believed that the weight of authority sustains the right of these persons to deal in shares of the corporation where the transaction is free from fraud. The officers are not bound to acquaint a stockholder willing to sell his stock with facts which would enhance the price of the stock. The officers are trustees for the stockholders only as to the management of the corporation and not in their private dealings.'' (P. 807.)

The majority rule is in substance that a director is a fiduciary to the corporation as an entity and not to the stockholders as individuals. The courts, however, recognized that this ''arm's length'' type of operating was unfair to minority interests and was not workable. In *American Trust Co.* v.. *California etc. Ins. Co.*, 15 Cal.2d 42, 56-57 [98 P.2d 497], the court states: ''In sharp contrast with this view is the so-called minority rule, which recognizes the director's obligation to the stockholders individually as well as collectively, and refuses to permit him to profit at the latters' expense by the use of information obtained as a result of his official position and duties. This view, while generally conceded to be in the numerical minority, is followed by able courts, and textwriters who have examined the subject. [Citations.]

''But this simple statement of the majority and minority rules does not present the true picture, for a number of jurisdictions which are classed in support of the majority view have recognized a major exception in the so-called 'special facts' doctrine: Conceding the absence of a fiduciary relationship in the ordinary case, they nevertheless hold that where special circumstances or facts are present which make it inequitable for the director to withhold information from the stockholder, the duty to disclose arises, and concealment is fraud. . . .''

The trial court here instructed the jury in detail on the special facts doctrine. The court stated: '' 'The mere sale of a controlling stock interest by those who own such an interest does not give rise to any duty of the majority shareholders to secure a sale at the same price for all, even though the sellers hold a managerial office in the corporation.' ''

'' 'In the absence of special facts, any director, officer or

shareholder is entitled to sell his stock to a third person for such price; and on such terms as he may desire. However, officers, directors, and controlling stockholders of a corporation owe a limited fiduciary duty toward minority stockholders in the matter of sales of stock where there are special facts which make it inequitable for them to act without regard to the interests of other shareholders. In determining whether such special facts exist *that a fiduciary duty should be imposed,* you may consider the following circumstances: (a) The number of stockholders in the corporation; (b) Whether or not a sale of all or almost all corporate stock appeared likely in the immediate future; (c) Whether or not the sale of stock involved a misuse of corporate office or a breach of duties owing to the corporation by the officers, directors, or controlling stockholders in question; (d) whether or not there was a partial disclosure of relevant facts by the officers, directors, or controlling stockholders which disclosure was not the whole truth; (e) Whether or not the corporation possessed a unique asset and whether or not a principal objective of the purchaser of the corporate stock was to acquire that asset; (f) Any other acts by the officers, directors, or controlling stockholders in question which tended to depreciate the value of the minority stock. . . .'' (Italics added.)

The court then prefaced a number of other instructions (68, 69, 70, and 71) with the words *"If you find special facts such as to impose upon an officer or director a fiduciary duty to the stockholders, then . . ."* (Italics added.) The instructions relative to the special facts doctrine while stating accurate legal principles under certain factual situations, erroneously placed the burden of proof on appellants here and gave the jury the right to determine whether or not a fiduciary relationship existed.

Three California appellate court cases decided between 1940-1945 discuss the special facts doctrine (*American Trust Co.* v. *California etc. Ins. Co., supra,* 15 Cal.2d 42; *Hobart* v. *Hobart Estate Co.,* 26 Cal.2d 412 [159 P.2d 958]; *Taylor* v. *Wright,* 69 Cal.App.2d 371 [159 P.2d 980]). In each case the court recognized that there was a majority rule holding that the fiduciary duty of a majority stockholder or director is to the corporation and not the stockholder, but that a *limited fiduciary relationship* becomes alive upon the presence of *"special facts."* The courts also recognize the existence of a minority rule which holds that the directors occupy a fiduciary relationship to the stockholders individually as well as corpo-

rately. It is important to note that in *American Trust, supra, Hobart, supra,* and *Taylor, supra,* the court recognized the inequities of the so-called majority rule and found special facts existed which formed the basis for a judgment for the plaintiffs (minority stockholders). The court in *Taylor, supra,* added an interesting observation, i.e., ''While it is true that a numerical majority of the decided cases have adopted the legalistic view that a director owes no duty at all to the stockholders, a substantial minority have adopted the more realistic view that such a duty exists because the stockholders have placed the directors in a strategic position where they can secure first-hand knowledge of important developments, and where they can make it appear the shares are much less valuable than they really are. *The astonishing thing is that practically every legal writer in this field has approved the so-called minority view.*'' (P. 380; italics added.) (See Berle, *Publicity of Accounts and Directors' Purchases of Stock,* 25 Mich.L.Rev. 827; Laylin, *The Duty of a Director Purchasing Shares of Stock,* 27 Yale L.J. 731; Wilgus, *Purchase of Shares of Corporation by a Director from a Shareholder,* 8 Mich. L.Rev. 267; 3 Fletcher, Cyclopedia Corporations (Perm. ed.), §§ 848 and 1174; 32 Mich.L.Rev., 678; 14 Minn.L.Rev. 530; 11 Wis.L.Rev. 547; 29 Cal.L.Rev. 67; 54 Harv.L.Rev. 1191, but see Walker, *The Duty of Disclosure by a Director Purchasing Stock from his Stockholders,* 32 Yale L.J. 637.)

In *Taylor* v. *Wright, supra,* 69 Cal.App.2d 371, 381-382, the court said: ''The so-called majority rule is predicated on the theory that the corporation—the collective stockholders— is a separate and distinct legal entity, an artificial personality, to whom the director owes his duty. The legal writers above referred to and the more recent cases adopting the minority view, have pointed out the fallacy of this reasoning. These authorities logically point out that the detailed information a director has of corporate affairs is in a very real sense property of the corporation, and that no director should be permitted to use such information for his own benefit at the expense of his stockholders. The so-called majority rule permits a director to secure for himself profits rightfully belonging to all. Such a rule offends the moral sense, and is contrary to our modern concept of the duty of a director towards those he represents.

''.     .     .     .     .     .     .     .     .     .     .     .     .

''The exact rule that exists in this state is somewhat uncertain. The cases of *Ryder* v. *Bamberger,* 172 Cal. 791 [158 P.

753] ; *Robbins* v. *Pacific Eastern Corp.,* 8 Cal.2d 241 [65 P.2d 42] ; *McCord* v. *Martin,* 47 Cal.App. 717 [191 P. 89], and *Bacon* v. *Soule,* 19 Cal.App. 428 [126 P. 384], contain some language that supports the advocates of the so-called majority rule. These cases were analyzed at length by the Supreme Court in the *American Trust Co.* case, *supra.* It was there held that what was said in these cases on the subject was dictum. At page 61 the court concluded as follows: 'In this connection we may observe that the question is still open in this state as to whether we shall follow the majority rule, the majority rule as modified by the ''special facts'' doctrine, or the minority rule; and a decision on this question would be immaterial here.'

''In the present case the trial court instructed on the so-called 'special facts' doctrine, and no challenge is made as to the form of the instruction. Whether this rule, or the so-called minority rule is ultimately to be adopted in this state need not now be decided. No reasonable argument can be advanced against the adoption of at least the 'special facts' limitation to the majority rule. *A fair reading of the American Trust Co. case, supra, indicates that the Supreme Court, although not directly deciding the point, has indicated a disapproval of the so-called majority rule, and that when the point is directly presented to it, it will adopt either the 'special facts' doctrine or the minority rule.''* (Italics added.)

More recent cases followed the Supreme Court's theory of the special facts doctrine (*Jaynes* v. *Jaynes,* 98 Cal.App.2d 447 [220 P.2d 598] ; *Haussler* v. *Wilson,* 164 Cal.App.2d 421 [330 P.2d 670] ; *Low* v. *Wheeler,* 207 Cal.App.2d 477 [25 Cal.Rptr. 538] ) in imposing a limited fiduciary duty of directors toward stockholders under the existence of special facts. The special facts doctrine has been limited to those cases where the directors or majority shareholders purchase the stock of the minority shareholders by withholding information concerning the value of the stock.

*Low* v. *Wheeler, supra,* falls within this classification (the purchase of minority stock by directors), although the directors and majority shareholders did not actually themselves negotiate for, or purchase the minority's interest. They prevailed upon the outsiders, who were interested in buying only the main asset of the corporation, to buy the stock of the corporation (instead of the desired asset) by first buying the shares held by the minority stockholders and thereafter, by prior arrangement which they concealed from the minority,

buying the majority interest's stock at a higher price. Furthermore, in *Low* v. *Wheeler,* the court, in answering the director-stockholder's argument that no fiduciary relationship existed, held only that it was not error to instruct that such a fiduciary duty existed in the presence of special facts. This cannot be considered the equivalent of a holding that special facts are a necessity in order that a fiduciary relationship exists.

We have concluded that the special facts doctrine should not be applied to the case before us, i.e., to factual situations where the majority stockholder-director sells the controlling block of stock to outside purchasers and by doing so causes the minority stock to be devaluated. *This doctrine requires a finding that special facts be present before it may be found that a fiduciary relationship exists.* Such doctrine was found necessary as an exception to the theory that the majority stockholder-director is a fiduciary to the corporation but not to the stockholders. This theory as expressed in *Ryder* v. *Bamberger, supra,* has become so eroded by exceptions and statements of fiduciary obligations in more recent decisions (specifically those involving fraud, concealment, looters and incompetents) that it can be said that it no longer exists.

Here the presence of special facts is unnecessary for a determination of Halbert's relationship to the corporation and the minority stockholders. *In his capacity as president of the Association, chairman of the board of directors and dominant stockholder, Halbert stood in a fiduciary relationship to the corporation and to the minority stockholders as beneficiaries thereof, and the jury should have been so instructed. (Remillard Brick Co.* v. *Remillard-Dandini Co.,* 109 Cal.App.2d 405 [241 P.2d 66]; *Pepper* v. *Litton,* 308 U.S. 295 [84 L.Ed. 281, 60 S.Ct. 238]; *Perlman* v. *Feldmann,* 219 F.2d 173 [50 A.L.R. 2d 1134].)

In *Remillard Brick Co.* v. *Remillard-Dandini Co., supra* (pp. 419-420), the court said: "It is hornbook law that directors, while not strictly trustees, are fiduciaries, and bear a fiduciary relationship to the corporation, and to all the stockholders. They owe a duty to all stockholders, including the minority stockholders, and must administer their duties for the common benefit. The concept that a corporation is an entity cannot operate so as to lessen the duties owed to all of the stockholders. Directors owe a duty of highest good faith to the corporation and its stockholders. It is a cardinal principle of corporate law that a director cannot, at the expense of the corpora-

tion, make an unfair profit from his position. He is precluded from receiving any personal advantage without fullest disclosure to and consent of *all* those affected. The law . . . in case of unfair dealing to the detriment of minority stockholders, will grant appropriate relief. Where the transaction greatly benefits one corporation at the expense of another, and especially if it personally benefits the majority directors, it will and should be set aside. In other words, while the transaction is not voidable simply because an interested director participated, it will not be upheld if it is unfair to the minority stockholders. These principles are the law in practically all jurisdictions. (3 Fletcher, Cyclopedia of Corps. (Perm. ed.), p. 173, § 838 et seq.; 13 Am.Jur., p. 948, § 997 et seq.)'' (See also *Pepper* v. *Litton, supra,* 308 U.S. 295, 306 [84 L.Ed. 281, 289, 60 S.Ct. 238]; *Bancroft-Whitney Co.* v. *Glen,* 64 Cal.2d 327, 345, 346 [49 Cal.Rptr. 825, 411 P.2d 921]; *Efron* v. *Kalmanovitz,* 226 Cal.App.2d 546 [38 Cal.Rptr. 148]; 9 Hastings L.J. 306.)

Judge Cardozo stated in *Mcinhard* v. *Salmon,* 249 N.Y. 458, 464 [164 N.E. 545, 62 A.L.R. 1], as follows: "Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. . . ."

We recognize that the above-cited cases which consider the majority stockholder-director to be a fiduciary without the necessity of finding special facts do not involve the situation of the sale of majority stock. However, the case of *Perlman* v. *Feldmann, supra,* 219 F.2d 173, 175, in the context of a sale of stock to an outsider, finds that a director and dominant stockholder stands "in a fiduciary relationship to the corporation and to the minority stockholders as beneficiaries thereof." (Citing *Pepper* v. *Litton, supra,* 308 U.S. 295, and *Southern Pac. Co.* v. *Bogert,* 250 U.S. 483 [63 L.Ed. 1099, 39 S Ct. 533].)

Since the case before us was tried under the theory that Halbert was not a fiduciary unless special facts existed and since the jury and court found that special facts did not exist under the instructions, the conclusion of the court and jury that Halbert did not have a fiduciary duty is obviously not valid. (See trial court Finding XXV.)[4] Moreover, the jury

---

[4]Finding XXV: ''That in the facts surrounding the defendants' sale of their stock, including but not limited to the facts set forth in the

was improperly instructed as to the burden of proving breach of fiduciary duty, and therefore, the findings that Halbert did not breach his duty are also not valid.

. The court instructed the jury (Instructions 8 and 9) as follows: ''In civil actions, the party who asserts the affirmative of an issue must prove that issue by a preponderance of the evidence. . . .

''. . . . . . . . . . . . .

''A person occupying a fiduciary relationship with another is required to produce evidence that his actions were not fraudulent and did not breach any fiduciary duty. This requisite does not, however, transfer the burden of proof on the issue of fraud or breach of fiduciary duty, which burden is on the plaintiffs. The evidence required to satisfy this burden of preponderance must be clear and convincing.

''In general, the burden of proving fraud is upon the person charging fraud. Where it is shown that a fiduciary relationship exists, however, and it is further shown that the fiduciary acquired an advantage, he is required to show fairness and good faith to overcome a presumption to the contrary. Whether he has done so is a question of fact, but it should be remembered that the basic burden of proof remains with the person charging fraud.''

The court by these instructions instructed the jury that a person occupying a fiduciary relationship is required to produce evidence that he did not breach any fiduciary duty where it is shown that the fiduciary acquired an advantage and there is a presumption that the fiduciary did not act in good faith. Yet the court also instructed that the basic burden of proof remains on plaintiff and that the presumption does not change this burden. These instructions are inconsistent.

It is now well established that our courts have placed the burden of proof squarely on the fiduciary when there is evidence that he secured an advantage for himself.

In *Efron* v *Kalmanovitz, supra,* 226 Cal.App.2d 546, 556, the court said: ''The basic principle governing the resolution of the problem presented in this case was expressed in *Pepper* v. *Litton,* 308 U.S. 295, at page 306 [60 S.Ct. 238, 84 L.Ed. 281, 289], as follows: 'A director is a fiduciary. [Citation.] So is a dominant or controlling stockholder or group of stockholders. [Citation.] . . . *Their dealings with the corporation*

Findings above, the court finds that there were not present such special facts as would impose upon the defendants a fiduciary duty to the plaintiffs in connection with the sale of defendants' stock.''

*are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein.* [Citation.] . . .'' (Italics added.)

In *Chung* v. *Johnston,* 128 Cal.App.2d 157, 164 [274 P.2d 922], the court said: ''A presumption of fraud may arise in the case of a fiduciary relationship from which an undue advantage was gained. Here a fiduciary relationship existed, and there was substantial evidence showing that defendants secured an advantage which plaintiff did not intend. This raised a presumption of fraud, and the burden was cast on defendants to show fairness and good faith in all respects. A presumption of fraud is sufficient to support a finding thereof. [Citation.]''

In *Solon* v. *Lichtenstein,* 39 Cal.2d 75, 82 [244 P.2d 907], the court said: ''Here a confidential relationship was admitted, and plaintiff presented substantial evidence to show that defendant secured an advantage which was not intended. This raised a presumption of fraud and undue influence, and the burden was cast on defendant to show fairness and good faith in all respects. (*Nobles* v. *Hutton, supra,* 7 Cal.App. 14, 20-21 [93 P. 289] ; *Pleasants* v. *Hanson, supra,* 48 Cal.App. 626, 630-631 [192 P. 183] ; *Johnson* v. *Clark, supra,* 7 Cal.2d. 529, 534 [61 P.2d 767] ; *Hatch* v. *Penzner, supra,* 44 Cal.App. 2d 874, 879 [113 P.2d 295].)'' (See also *Trafton* v. *Young-blood,* 69 Cal.2d 17, 27, 28 [69 Cal.Rptr. 568, 442 P.2d 648] ; *Perlman* v. *Feldmann, supra,* 219 F.2d 173.)

The trial court here also instructed on the presumption of innocence and instructed on inference of fraud. Instruction No. 88 stated: ''If you find a conspiracy, then each defendant whom you find to be a member of the conspiracy is jointly liable with each other member for all damages caused by the conspiracy.'' Instruction No. 89 stated: ''The law presumes that a person is innocent of crime of wrong, that a person intends the ordinary consequence of his voluntary act, that money paid by one to another was due to the latter, that private transactions have been fair and regular, that the ordinary course of business has been followed, and that the law has been obeyed. These presumptions are disputable presumptions and may be controverted by evidence.''

These instructions when read with the instructions on the

burden of proof are obviously confusing and erroneously placed the burden of proving all issues on appellants when that burden should have been cast upon respondents.

We have determined that Halbert occupied a fiduciary position in the Association and that he owed fiduciary obligations to the stockholders as well as to the Association. ██ We have also found that Halbert obtained for himself and the other respondents a price for their stock not thereafter available to the minority stockholders, and further, that the sale of the block of majority stock and the manner in which it was sold caused the minority stock to be devaluated.[5]

The evidence here does not establish fraud or concealment on the fiduciary, nor is it the ordinary case of the fiduciary withholding information in the purchase of the minority shares. Also, the facts do not involve a sale of the majority block of stock to looters or incompetents for which the fiduciary might be held chargeable. (See *Gerdes* v. *Reynolds,* 28 N.Y.S.2d 622.)

The facts do disclose that Halbert sold his stock to purchasers who after acquiring the stock announced that their policy of operation radically changed previous policies of the Association, i.e., there would be no distribution of profits by payment of dividends for a period of 10 to 20 years. The obvious effect of such policy on minority stockholders would be to create a feeling of uncertainty as to the value of their stock, resulting in a susceptibility to pressure to sell.

Every sale of a block of control stock should not per se be subject to attack, but where the amount received by the majority-director seller is so disproportionate to the price available to the minority stockholders, then such fiduciary-seller must show that no advantage was taken if the sale is questioned. This is especially true in the instant case where Halbert in his triple fiduciary capacity was completely indifferent to his obligations to the minority stockholders. He did not advise the directors or stockholders that he had been approached by persons who desired to acquire the Association. After obtaining an agreement for the price he desired for his own stock and while still an officer-director, he failed to make any effort to obtain for the minority substan-

---

[5] We must point out that the court's Finding XXIII the minority stock had an approximate value of book value is also lacking in evidentiary support. Respondents' expert witness, who did not deal in purchase of minority interests, stated the minority stock was worth not less than book value, and appellants' expert witness gave it a value in excess of book value.

tially the same price that he received and, in fact, worked actively for the buyers in assisting them to acquire all the stock at a low figure by voicing his recommendation to the minority holders that they sell at below book value. Halbert's other actions in permitting the buyers access to the books, records and reports of the Association, and his agreement to refrain from the payment of dividends only serve to fortify the conclusion that he worked to obtain an advantage for himself and effectively placed the buyers of his stock in a position to dictate terms to the detriment of the minority holders. Further, in advising the minority stockholders to sell their stock for $300 or they might get nothing, he was using his office, experience and reputation gained in the conduct of their affairs to prevent the minority an opportunity to obtain a higher price for their stock.

The evidence clearly indicates that respondent Halbert had no accurate knowledge or clear conception of his fiduciary duties in his triple capacity as president, chairman of the board and dominant stockholder, and that his complete indifference and affirmative actions took the form of rationalization on his part that such success as attended the Association was due to his efforts alone and that he and a favored few should reap the rewards to the exclusion of the other stockholders.

Because of the errors in the instructions and the clear violation by Halbert of his fiduciary obligations to the minority stockholders, the judgment of the trial court must be reversed.

While the briefs and our own research have failed to reveal any California case which is factually parallel to the case before us, there are established guidelines by decisions relative to the obligations of a fiduciary, by the law review writers and by the considerations by courts in other jurisdictions.

The law review writers, while approaching the problem and remedy on different theories, are unanimous in their ''end results'' that the majority stockholder-director may not retain an advantage over the minority by reason of his sale of his majority block of stock.

The appellants invite attention to the views expressed by Professors Berle, Andrews, Jennings and others. (See Berle,[6] *The Price of Power: Sale of Corporate Control* (1965) 50

[6]Professor of Law, Columbia University, School of Law, New York, N. Y.

Cornell Law Quarterly, 628; Professor William D. Andrews[7] (78 Harv.L.Rev. 505); and Professor Richard W. Jennings[8] (44 Cal.L.Rev. 1, 39, and others.)

The Berle theory is that the investment value of all stock is the same, and when a majority stockholder receives an amount over the investment value, he is receiving a premium for the control, that control is a corporate asset and the amount received over the investment value belongs to the corporation or its stockholders.

The Andrews-Jennings theory is that whenever a controlling shareholder sells his shares, every other holder of shares of the same class is entitled to have an equal opportunity to sell his shares or a pro rata part of them on substantially the same terms.

The basic theory of these writers, states Jennings, is that control shares in a modern business corporation possess their special value from the strategic position which is enjoyed by them because of the collective powers inherent in the corporate structure. These shares provide a leverage for enabling the corporate insiders to reap profits which in fairness should be shared with the other stockholders.

The Berle-Jennings theories were considered in the decision of the commissioners of the Ontario Securities Commission, entitled "In the Matter of the Securities Act and in the Matter of the Consolidated Manitoba Mines Limited and Great Basin Metal Mines Limited" dated December 1966. The Ontario commission denied a transfer of stock in escrow, on the basis that shareholders having effective control are, when selling their shares, under a legal duty not to prejudice either the company or the remaining shareholders, and that it would question such sale or transfer when either a peculiar benefit is accruing to the vendors or an equal opportunity to share in the purchase price is not given to all shareholders. (See also *Securities & Exchange Com.* v. *Texas Gulf Sulphur Co.*, 258 F.Supp. 262, 278, 279, re intent of Securities and Exchange Commission in protection of shareholders.)

In *Perlman* v. *Feldmann, supra,* 219 F.2d 173, the court in remanding for a determination of damages in a sale by the majority stockholder-director of his block of majority stock used language which is particularly applicable to the case before us: "But when the sale necessarily results in a sacrifice

[7] Assistant Professor of Law, Harvard Law School, B.A., Amherst, 1952; LL.B., Harvard, 1955.

[8] Professor of Law, University of California, Berkeley.

of this element of corporate good will and consequent unusual profit to the fiduciary who has caused the sacrifice, he should account for his gains. So in a time of market shortage, where a call on a corporation's product commands an unusually large premium, in one form or another, we think it sound law that a fiduciary may not appropriate to himself the value of this premium. *Such personal gain at the expense of his coventurers seems particularly reprehensible when made by the trusted president and director of his company. In this case the violation of duty seems to be all the clearer because of this triple role in which Feldmann appears, though we are unwilling to say, and are not to be understood as saying, that we should accept a lesser obligation for any one of his roles alone.* (Italics added.)

"Hence to the extent that the price received by Feldmann and his co-defendants included such a bonus, he is accountable to the minority stockholders who sue here." (P. 178.)

The tremendous growth of the stockholder population in the United States[9] and the need for the continuation of the investor's dollar in our corporate system of business may in the future require legislative action or the adoption by the courts of one or the other law writer's recommendations for the investor's protection. We feel, however, that a remedy is already afforded an aggrieved minority stockholder which is in harmony with established principles, i.e., that the fiduciary obligations of the majority stockholder-director are sufficient protection for all stockholders if those fiduciary obligations are strictly observed and enforced.

In the determination that there was a violation of fiduciary obligation which was actionable by minority stockholders, we have not adopted specific rules of procedure for fiduciaries but have determined that each case must be decided on its merits. In this area it seems that no hard and fast rule is workable. The merits of following specific procedures in order to give the minority stockholders an equal opportunity to share in the proceeds of the sale may be offset by other circumstances making such procedures impossible or unworkable in our economic system.

Although the position of the minority stockholder is sometimes a precarious one, especially in corporations where there

---

[9]The New York Stock Exchange reported in January 1969 that the United States stockholder population has spurted to 26.4 million (persons), an increase of 2.5 million in the last year and 6.5 million since 1965.

are but few stockholders, it is now recognized that such minority stockholder needs and is entitled to protection from actions by majorities. ▮ The rule we have adopted here simply is that the duty of the majority stockholder-director, when contemplating the sale of the majority stock at a price not available to other stockholders and which sale may prejudice the minority stockholders, is to act affirmatively and openly with full disclosure so that every opportunity is given to obtain substantially the same advantages that such fiduciary secured and for the full protection of the minority. This duty was violated here.

▮ It is concluded that a review of the record clearly establishes that Halbert failed to perform his obligations as a fiduciary in the protection of the interests of the minority stockholders. The respondents therefore may not retain the advantage realized from Halbert's actions in the sale of the majority stock at $2\frac{1}{2}$ times book value while the minority interests received but book value, and that difference when ascertained must be equitably distributed to all stockholders who sold their stock to the buyers.

No useful purpose could be accomplished by retrial of all issues. There is no reason to believe that evidence could be adduced which would now disclose that the fiduciary obligations of Halbert had been performed.

The difference plus interest between the exact amount received by respondents and that amount received by appellants must be ascertained, however, and computed so that each stockholder, including respondents who sold their stock, will share in proportion to his stock interest. This is generally the formula approved by the court in *Low v. Wheeler, supra,* 207 Cal.App.2d 477, 487, and which we believe to be equitable.

The relief to those suffering detriment by a proven breach of fiduciary obligation thus does not differ and is consistent with the relief granted when there is a fraud or concealment by a fiduciary, or when the factual situation falls within those cases involving fiduciaries under the special facts doctrine.

As this case is to be reversed with directions for judgment for appellants on their first cause of action, which is clearly a proper class action and which has not been questioned here, it is unnecessary to determine the question as to the propriety of the trial court's dismissal of the second cause of action (which was to those plaintiffs who were not represented at the trial and who did not appear). That question has now become moot.

The judgment of the trial court as to the first and second causes of action is reversed.

Judgment is directed to be entered on behalf of appellants on the first cause of action with directions to determine, allocate and distribute equally among all shareholders the premium received by the respondents upon sale of their majority interest in the corporation over and above the sum received by the minority shareholders upon sale of their shares. Except that any liability of Vena Halbert as administratrix of the estate of Edward F. Halbert to be paid by said estate in the due course of administration shall not exceed the sum of $120,600.

Appellants shall also be awarded interest.

Upon entry of said judgment thereof, the second cause of action is to be ordered dismissed.

The cause is remanded to the trial court for further proceedings pursuant to this opinion.

Salsman, J., concurred.

DRAPER, P. J.—I concur in the judgment.

I would, however, base the decision upon the special facts doctrine.

Defendant Halbert, as president and chairman of the board, was the effective operating head of the corporation, completely controlling the conduct of its business. With his undisputed power over his wife's shares, he controlled 53 percent of the corporation's voting stock. This combined control of operations and of voting power goes to show him to be a fiduciary as to the minority shareholders. The special facts which establish this fiduciary capacity and show a breach of his trust consist of his refusal to consider an offer for the corporate assets as a whole, his affirmative effort to persuade minority shareholders to sell for far less than book value, his agreement to secure the necessary resignations to facilitate prompt transfer of operating control, his knowledge of the buyer's plan to withhold dividends and thus depreciate the value of the minority shares, his opening of the company's books to the prospective purchaser, and his concealment of all these facts from the minority stockholders. All these facts are established by uncontradicted evidence. It follows that the court's finding (the jury verdict was but advisory) was unsupported by the evidence and that the liability of defendants is established as a matter of law. This case seems to me to fall within the

rule of *Low* v. *Wheeler,* 207 Cal.App.2d 477 [25 Cal.Rptr. 538], or, at most, to require but a moderate and reasonable extension of that rule. Hence I would base the decision upon the special facts doctrine as applied in *Low.*

On April 25, 1969, the opinion was modified to read as printed above.