Joseph **GORDON**, Plaintiff,

v.

**FUNDAMENTAL INVESTORS, INC.,**
**et al., Defendants.**

**No. 72 Civ. 2943.**

United States District Court,
S. D. New York.

June 7, 1973.

Shatzin & Cooper, New York City, for plaintiff; by Edward Labaton, New York City, of counsel.

Pollack & Singer, New York City, for all defendants except Fundamental Investors, Inc.; by Daniel A. Pollack, Martin I. Kaminsky, New York City, of counsel.

Seward & Kissel, New York City, for defendant Fundamental Investors, Inc.; by Eugene P. Souther, New York City, of counsel.

GURFEIN, District Judge.

This is a motion to dismiss a class action complaint, pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted, on the ground that the plaintiff lacks standing to assert the claim alleged, since the claim belongs to Fundamental Investors, Inc. ("Fundamental"). Fundamental is an open-end mutual fund. It is registered as an investment company under the 1940 Act. 15 U.S.C. §§ 80a—1 et seq.

The complaint is brought as a class action by Joseph Gordon, owner of sixty shares of Fundamental stock from 1965 up to June 1972. The action was brought July 11, 1972 after the plaintiff had sold his stock. The defendants are Fundamental, its directors in June 1969, Anchor Corporation (the investment advisor of Fundamental) and its directors in July 1969, and Washington National Corporation ("Washington") which subsequent to July 1969 became the advisor to Fundamental.

Jurisdiction is invoked under the Investment Company Act of 1940, 15 U.S.C. §§ 80a—1 et seq., the Rules and Regulations of the Securities and Exchange Commission and upon the principle of pendent jurisdiction.

The complaint alleges substantially the following.

In about March 1969, Washington and Anchor entered into an agreement (for merger) pursuant to which Washington obtained 95% of Anchor's voting stock in exchange for Washington's securities having a fair value of approximately 60 million dollars. The consummation of the agreement was conditioned upon the approval of Fundamental shareholders "of management and distributors contracts between Anchor and Fundamental, as required by the Investment Company Act of 1940."

Anchor used its control of Fundamental's proxy machinery to secure the approval of Fundamental's shareholders of the investment advisor's contract, which was approved by its shareholders on July 29, 1969. The transaction was, in effect, a sale by Anchor of its advisory contract with Fundamental and of its preferred capacity as a distributor of Fundamental shares in breach of Anchor's fiduciary obligation to Fundamental and its shareholders. Washington and the individual defendants knew or should have known of the impropriety of the transactions, and aided and abetted Anchor "in its breach of its fiduciary obligation *to Fundamental*" (Compl. ¶17; emphasis supplied). "Those defendants who were shareholders of Anchor prior to its transactions with Washington wrongfully profited at the expense of *Fundamental*" (Compl. ¶18; emphasis supplied).

The proxy statement submitted to Fundamental stockholders on the basis of which their shares were solicited for approval of the contract between Anchor and Fundamental, which approval was obtained on July 29, 1969 was false and misleading and operated as a fraud and deceit upon Fundamental and its shareholders in that: (a) the proxy material omitted to state that the premium of approximately 60 million dollars was unlawfully paid in violation of Anchor's fiduciary obligation to *Fundamental;* (b) it omitted to state that the premium was paid to induce Anchor to use its control of Fundamental's proxy machinery to obtain approval of the transaction; (c) it omitted to state that the directors of Fundamental were dominated and controlled by Anchor and served its interests; (d) it omitted to state that Fundamental's advisory contract had special

value because of Anchor's illegal practices including "give ups," "reciprocals" and "interposition" all of which conferred no benefits on Fundamental, but created a substantial profit for its advisor; (e) it omitted to state that a corporate opportunity belonging to Fundamental had been usurped; and (f) it omitted to state that the defendants conspired to cause Fundamental and its shareholders to approve the contract with *Anchor* (sic).

The class allegedly represented consists of "all those persons (other than defendants and those in privity with them) who held stock in Fundamental on July 29, 1969 at which time approval of a new advisory contract between Washington and Fundamental was obtained.[1]

Judgment is demanded, on behalf of the plaintiff and of the class, against the defendants other than Fundamental jointly and severally in the total amount of the actual damages proved by members of the class, which damages shall be the amount of all profits derived by Anchor and its shareholders by virtue of the transaction complained of.

The plaintiff's position is not only that the gravamen of the complaint is the alleged violation of the proxy rules of the SEC but also that the claim belongs to the holders of Fundamental stock on July 29, 1969.

The question is posed whether a succession fee claim may be brought *only* as a derivative action or whether it may be brought as a class action on behalf of those who were shareholders at the time of the wrong.

■ The plaintiff contends that the proxy violations form an entirely separate basis for jurisdiction of a class action, and it is true that the Court of Appeals in Rosenfeld v. Black, 445 F.2d at 1349–1350 did treat the alleged proxy rule violation as distinct from the substantive violation of fiduciary duty under the Investment Company Act. Assuming that a proxy violation may, indeed, present an independent right, the nature of the right can only be determined from the nature of the wrong. A plaintiff in a class action must show standing, and standing generally derives from injury to the plaintiff or the conversion of a right belonging to the plaintiff for which the defendants are accountable.

■ Thus, while a shareholder may sue for violation of a proxy rule, J. I. Case v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Mills v. Electric Auto-Lite Company, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970), he must, like any other plaintiff, have been affected in his own interest by the material omission or misstatement to recover on his own behalf.[2]

■■ It has long been the rule of law that mere diminution in the value of his stock because of a wrong done to the corporation does not give rise to an individual claim for relief by the sharehold-

1. The basis for the claim that the shareholders of the investment advisor could not sell their stock at a premium because they were fiduciaries was first enunciated in the seminal case of Rosenfeld v. Black, 445 F.2d 1337 (2 Cir. 1971). That case was decided on June 22, 1971, almost two years after the alleged breach of fiduciary duty in the Fundamental case.

2. There is language in both J. I. Case v. Borak, 377 U.S. 426, 431, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) and Mills v. Electric Auto-Lite Company, 396 U.S. 375, 378, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) which tends to imply standing for the defrauded voter-shareholder to sue on his own behalf after a merger has been consummated with the use of a false proxy statement. While the Supreme Court expressly disavowed passing on the question of the form of relief, 377 U.S. at 435, 84 S.Ct. 1555, 396 U.S. at 386–389, 90 S.Ct. 616, we can assume that there may well be standing to sue directly in the case of a merger which results in the dilution of the shareholder's interest. That is in accord with precedent. See cases cited in the text. It would not necessarily apply, on the other hand, in situations like the sale of stock by a controlling shareholder, where there has been no dilution of the plaintiff's proportionate interest in the corporation.

er. Smith v. Hurd, 53 Mass. 371 (1847); Koster v. Lumberman's Mutual Co., 330 U.S. 518, 522, 67 S.Ct. 828, 91 L.Ed. 1067 (1947); Kauffman v. The Dreyfus Fund, Inc., 434 F.2d 727 (3 Cir. 1970). Relief for harm done to the corporation is ordinarily awarded to the corporation, not to its shareholders individually. See Keenan v. Eshleman, 23 Del.Ch. 234, 2 A.2d 904 (Sup.Ct.1928).

■ There are circumstances, of course, where relief will be awarded in favor of shareholders individually rather than of the corporation. See Note, Individual Pro Rata Recovery in Stockholders Derivative Suits, 69 Harv.L.Rev. 314 (1956). Thus, a shareholder has a direct right to attack a corporate transaction which dilutes his proportionate ownership. Witherbee v. Bowles, 201 N.Y. 427, 95 N.E. 27 (1911); Stokes v. Continental Trust Co., 186 N.Y. 285, 78 N.E. 1090 (1906); Horwitz v. Balaban, 112 F.Supp. 99 (S.D.N.Y.1949).

There is a fundamental distinction, however, between an action by shareholders as a class and an apportionment of recovery to certain shareholders as part of a judgment in a derivative suit. *Cf.* Matthews v. Headley Chocolate Co., 130 Md. 523, 100 A. 645 (1917), where the corporation sued in its name for the benefit of innocent minority shareholders, with Stokes v. Continental Trust Co., *supra.* See Note, *supra,* 69 Harv.L.Rev. 1314.

Perlman v. Feldmann, 219 F.2d 173 (2 Cir. 1955), *cert. denied,* 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955) is perhaps the classic example. There Feldmann, a controlling shareholder of Newport Steel Corporation, sold his stock to Wilport. Perlman, a minority shareholder of Newport brought a *derivative* suit against Feldmann and other selling shareholders on the theory that the power to allocate steel sales in a time of scarcity was a corporate asset and that part of the price received by the Feldmann group was a premium for control of the product. The Court of Appeals held for the plaintiff.

In that case, if the Feldmann group had been required to disgorge the premium to Newport, the corporate entity, Wilport would have got back for itself a large share of the premium, for it was now the controlling stockholder. The Court, accordingly, fashioned a remedy, in the unusual circumstances, by allowing recovery to go directly to the minority shareholders "since neither Wilport nor their successors in interest should share in any judgment which may be rendered." 219 F.2d at 178. That did not necessarily mean that the recovery went directly to the minority shareholders because they had a direct right to it, although Judge Swan, in dissent, did think that is just what it did mean. 219 F.2d at 180. The minority shareholders were not the original shareholders at the time of the wrong, however, but were present shareholders.

What is involved in this case is a valuable advisory contract between Anchor and Fundamental cast in a fiduciary setting. The shareholders of Anchor were not parties to the contract. The Court of Appeals held in Rosenfeld v. Black, *supra,* that the status of an investment advisor was akin to that of a corporate officer or director. Neither may receive private compensation for the sale of his office or for the recommendation of a successor. The theory is not that all the shareholders are entitled to share in the bribe but rather that one who sells an asset he does not own must turn over the proceeds to the true owner. The true owner is the corporation. The malefactor, according to *Rosenfeld,* is the selling shareholder. He owes that part of the proceeds which is the premium to the corporation that owned the asset. As in the case of corporate opportunity, the opportunity diverted must be recompensed to the corporation, not to its shareholders.

The anthropomorphic concept of the corporation under which American business lives treats it as a person distinct from its shareholders. And while both scholars and skeptics may doubt the rig-

id application of such a conceptual rule, there is no other practical standard to go by. But *cf.* Andrews, The Stockholder's Right to Equal Opportunity in the Sale of Shares, 78 Harv.L.Rev. 505 (1965). When a thing is stolen from a corporation one cannot divide its recovery among its stockholders. Aside from the rights of creditors, that would, in effect, amount to a declaration of a dividend or a partial liquidation.

■■ When it is justified by unusual circumstances, however, the recovery for the corporation in a derivative suit may be distributed directly to the shareholders, as was done in Perlman v. Feldmann, *supra,* but it would be to present shareholders. Such a solution would avoid double recovery against the selling shareholders. On the other hand, if the class action urged upon the Court were allowed, there would be two recoveries: one by the corporation on the derivative suit, and the other by the class for recovery of the same profit. While it is true that double recovery is not always a bar as, where the defendants wrong both their corporation and purchasers of stock from them, Diamond v. Oreamuno, 24 N.Y.2d 494, 504, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969), such a bizarre result, should be avoided, especially where breach of fiduciary duty may be found without proof of scienter. See Rosenfeld v. Black, *supra.*

■ In the instant case the complaint itself alleges various omissions from the proxy statement, each of which is the omission of a purported wrong done *to the corporation.* The premium was allegedly paid "in violation of Anchor's fiduciary obligation *to Fundamental*" (19a) (emphasis supplied), and to induce Anchor to use its control of the proxy machinery to obtain approval of that transaction (19b). The directors of Fundamental were dominated by Anchor (19c). There was special value to "Fundamental's advisory contract" because of Anchor's allegedly illegal purchase of "give ups" etc. (19d). The opportunity to negotiate its management agreements "properly belonged to Fun-

damental" (19e). There was a conspiracy to cause Fundamental and its shareholders to approve the contract with Anchor.

The complaint itself thus spells out that the fiduciary obligation allegedly breached was owed to Fundamental, the corporate entity. As has been noted, the contract was with Fundamental, not with its shareholders. If there was a corporate opportunity to sell the advisory service it belonged to the corporation, Fundamental.

Lastly, we may ask whether the conversion of the value of a corporate contract is not the same as the conversion of a tangible asset belonging to the corporation. The recovery of profit is a substitution for the item converted as well as a sanction against the defendants.

The plaintiff contends, however, that the analogy to the ordinary business corporation is imperfect. There is said to be a material difference between an ordinary business corporation in which the value of its assets is determined only upon liquidation, and an open-end mutual fund where redemption value is set daily. Its assets are securities portfolios and each shareholder, it is said, in reality holds an aliquot share of those assets because each shareholder has an absolute right to redeem his shares at any time at their exact net asset value. Investment Company Act, 15 U.S.C. § 80a—5(a)(1). Because a mutual fund is said to be an aggregation of a class of investors rather than a traditional business corporation it is contended that the wrong committed was really a wrong to the class of shareholders who approved the transfer.

The difficulty is that the assets are held by a corporate entity with a board of directors and it is owned by shareholders who have a right to vote. Its capital structure is carefully regulated. 15 U.S.C. §§ 80a—18(a), (f)(1), 80a—16. There is no personal liability for corporate acts. The duration of the corporation is perpetual. Every element

that attaches to the business corporation attaches to the investment company. The only material distinction is that the owner of open-end investment company stock cannot sell it freely on the market because there is no market, but he has the advantage of a compulsory redemption value. See United States v. Cartwright, Executor, 411 U.S. 546, 93 S.Ct. 1713, 36 L.Ed.2d 528 (May 7, 1973).

The "value" of the assets of a registered investment company are (1) market value and (2) with respect to other assets "fair value as determined in good faith by the board of directors." 15 U.S.C. § 80a—2(41). The directors could not have put a fair value on the premium at the time even if they had known a premium existed. .

The redemption feature of the open-end fund does not give the shareholder, in law, a share in the fund's assets. It simply determines the price at which he may redeem. The investment company is neither a trust nor a partnership.

The contention that the investment company open-end mutual fund differs from the ordinary business corporation appears to have been rejected by the Court of Appeals for the Third Circuit, Kauffman v. The Dreyfus Fund, 434 F. 2d 727 (3 Cir. 1970). In *Kauffman* the plaintiff sued, *inter alia*, on a direct cause of action against the investment advisor for alleged proxy violations in omitting to state that the investment advisor indulged in illegal practices known as "give ups" and "reciprocals."[3] The Court, assuming without discussion that a failure to establish an independent claim based on the alleged derelictions also defeated the claim based on a proxy omission thereof, held that a mutual fund investment company was not different from an ordinary business corporation. The Court said, "Nowhere in the cases do we find authority for the proposition that the ease and capacity of evaluating a shareholder's redemptive

value of mutual fund shares can vest in him a pro-rata share of the corporation's primary right to sue." 434 F.2d at 733. See also Weiner v. Winters, 50 F.R.D. 306, 310 (S.D.N.Y.1970, Levet, J.) and Herman v. Steadman, 50 F.R.D. 488, 490 (S.D.N.Y.1970, Bryan, J.).

█ If, as I conclude, there was no individual right in the plaintiff to claim an accounting of profits to himself as well as to his corporation, does his standing as a person to whom the allegedly misleading proxy statement was directed give an independent claim for relief?

█ It seems clear under the doctrine of *Borak* and *Mills, supra,* Note 2, that the proxy violation can give rise to an independent claim for money damages. But such a claim must be posited on actual damage or at least on an independent right of recovery to the shareholder. If no right of recovery resulted from the wrongful act itself, the failure to *disclose* that it had occurred will not, *ipso facto*, create a right of recovery in the shareholder. The sustaining of that portion of the complaint charging proxy violations in Rosenfeld v. Black, *supra*, 445 F.2d at 1349–1350, must be read in the light of the circumstance that the sole claim for relief there was derivative in nature.

Since affidavits have been supplied by both sides, the motion may be treated as one for summary judgment.

The facts of which I, therefore, take cognizance are that a derivative suit against substantially the same defendants has recently been settled with the approval of this Court. The plaintiff at bar has failed to intervene in the hearings on the settlement. He failed to object to the settlement upon the ground that the proceeds of any settlement should be apportioned among the shareholders at the time of the wrong.

After a good faith settlement, carefully supervised by this Court as to ade-

---

3. It is true that the failure of the Fund to recapture commissions would be a continuing breach of duty while the sale of an advisory contract is a single transaction. While the latter would make it easier to enforce the plaintiff's theory it would not change the nature of the claim *qua* claim.

quacy, it would be inequitable to impose additional liability on the same defendants. It is not the inequity alone, however, that dictates the result. It is also the demonstration that what may appear to be rather rigid conceptual reasoning for holding the claim to be solely that of the corporation also commends itself to fairness and common sense. In the light of Rosenfeld v. Black, *supra*, it is too late to say that the *derivative* suit may be barred altogether in favor of the *class suit*. Since the allowance of a class suit as well would make for double recovery and also effectively block settlement of the derivative suit, practical and equitable considerations support the conceptual considerations as well.

The motion for summary judgment is granted. The complaint is dismissed.

It is so ordered.