No. 30,794.

Frances A. Hotchkiss, *Appellant*, v. Floyd Fischer, *Appellee.*

(16 P. 2d 531.)

Opinion filed December 3, 1932.

*A. E. Crane* and *Kenneth Briggs,* both of Topeka, for the appellant.

*T. M. Lillard, Bruce Hurd* and *O. B. Eidson,* all of Topeka, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one by a former owner of corporate shares to recover damages from the president of the corporation for breach of duty of loyalty to the shareholder, in that the president purchased the shares for much less than their value without making full disclosure of facts pertinent to the transaction. The petition contained some specific allegations of fraudulent representation and concealment. The verdict and judgment were for defendant, and plaintiff appeals.

Plaintiff was a widow who lived at Burr Oak, Kan. On the death of her husband she became owner of 2,300 shares of the capital stock of the Elmhurst Investment Company. The Elmhurst company owned one-half of the capital stock of the Orlando Petroleum Company. The Elmhurst company's capital stock consisted of 200,000 shares of the par value of one dollar each. The capital of the Orlando company consisted of 50,000 shares of the par value of two dollars each, of which 46,560 shares had been issued. Defendant was a director and was president and a managing officer of each company.

The annual meeting of the Elmhurst company was to occur on January 17, 1927, at Topeka, Kan. Plaintiff was in need of money. If a dividend were declared by the board of directors at the time of the annual meeting, she desired to keep her shares. If a dividend were not declared, it would be necessary for her to sell the shares, and she feared that if a dividend was not declared she would be obliged to sell at a sacrifice. Plaintiff came to Topeka in advance

of the meeting, to attend the meeting and to obtain information bearing on her situation. She had an interview with defendant on January 12. She had another interview with defendant on January 13, and on January 15 he purchased her shares for $1.25 per share. On January 18 the directors declared a dividend of $1 per share.

The two companies issued statements showing their financial condition as of December 31, 1926. The secretary-treasurer of the Elmhurst company testified the book value of the Elmhurst stock was about $3.85 per share. A banker who had owned shares and who had bought and sold shares testified the book value was about $3.75 per share. Brokers dealt in the shares, and there was testimony that in 1926 the market price ranged from $1 to $1.15 per share.

At the first and principal interview, plaintiff inquired of defendant whether a dividend would be declared. Defendant replied he could not inform plaintiff whether a dividend would be declared and would have no information on the subject until he conferred with directors of the company who were coming to the meeting from New York.

Both companies were in litigation with the United States concerning income taxes. The December 31 statements carried contingent liability items on account of government claims of $138,-649.10 against the Elmhurst company, and $112,248.53 against the Orlando company. The tax claims were pending at the time of the annual meeting in 1926. While a dividend was then declared, there was testimony that the directors were then of the opinion further dividends should not be declared until the question of liability for the tax claims had been determined.

There was testimony that the New York directors left Buffalo on January 14 to attend the 1927 meeting, and arrived in Kansas City, Mo., on January 16. On the way to Kansas City these directors discussed the subject of declaring a dividend, and agreed among themselves that a dividend should be declared. On January 16, the day after defendant purchased plaintiff's shares, defendant went to Kansas City, met the New York directors, and ascertained their attitude toward declaration of a dividend.

There was conflict between the testimony of plaintiff and the testimony of defendant concerning the manner and extent of defendant's disclosure to plaintiff of facts concerning the financial condition of the two companies. Defendant testified he produced

the December 31 statements, placed them on a desk or table before plaintiff, and explained the statements to plaintiff item by item. Defendant testified concerning what he said about various items, testified he told plaintiff the companies were in sound financial condition, and testified as follows:

"I had before us a statement of both the Elmhurst and Orlando companies, which covered to the close of December 31, 1926. . . . I told her they were the most recent financial statements of both companies. . . . She made inquiry of me what the stock of her husband's estate was worth. I then told her, I have told you the condition of the affairs of the company, and I will be glad to furnish you any further information, and I further told her as to the matter of what you regard your stock to be worth, or what it might ultimately prove to be worth, is a matter you have to determine yourself."

Plaintiff testified defendant did not give the statements to her, and she did not remember that he read anything from them; but he did tell her different things about the statements—about some oil production which had declined, about drilling some dry holes, about defalcation of an agent who committed suicide, and loss of rent on a building—all of which made a dark picture. Plaintiff testified further as follows:

"He said that the condition of the company he felt sure was better than when he took it over, but he did not say it was in a good condition, and that was where I felt at a loss to know. That was what I was there for, to find out the condition of the company, and whether I felt like I could hold on to my holdings, or whether I had better just let them go before they diminished in value. . . .

"Mr. Fischer had a printed statement, but he didn't go into details anything like he did here to-day. I don't know what he did with the statements. . . . It came up face to face like we are talking. We didn't get right down to business. We were sitting at a table. Mr. Fischer produced a paper. I don't remember that he said it was a report. We didn't go into details like he did here. We just talked about it in general."

The financial statements of the two companies were introduced in evidence, and were explained to the jury by witnesses not parties to the suit who were competent to explain them. Copies of the statements are appended to this opinion.

The foregoing indicates nature of the testimony sufficiently to form a basis for consideration of the instructions to the jury and the jury's special findings of fact.

The court instructed the jury concerning the fiduciary relation of defendant to plaintiff and his duty to make full and fair disclosure to her of all the information he possessed and should have possessed, affecting value of the shares, before becoming a purchaser.

The court then supplemented the instructions already given by the following:

"6½. In connection with the instructions I have given you in regard to the duty of a president or managing officer of a corporation in the purchase of stock from a stockholder in a corporation, you are instructed that the defendant, as director and president of the Elmhurst company, was under no duty to the plaintiff to express to her his opinion as to the value of the shares of stock, and if you find that the defendant fully explained to her all the material facts which bore upon the financial condition of the company, either orally or by furnishing her with statements which explained fully and fairly showed the true financial condition of the Elmhurst Investment Company, and also of the true financial condition of the Orlando Petroleum Company, and stated to her, in substance, that he would give her any additional information which she might desire in regard to the condition of the company as was in his knowledge, and if defendant in fact did truthfully answer all questions of the plaintiff for additional information regarding the condition of the company, such conduct on the part of the defendant would constitute a full discharge of his duties to the plaintiff, and your verdict should be for the defendant."

The reference to furnishing plaintiff written statements of the financial condition of the companies could be applied in but one way—to the financial statements of December 31. There were no other statements shown to plaintiff or to the jury.

Reverting to the testimony, plaintiff's testimony was to the effect that defendant's disclosure of information was oral, including oral references to the statements. Defendant's testimony was to the effect that this disclosure was by written statements which he fully explained. The instruction sanctioned disclosure in either of two ways: first, by oral presentation of all material facts, and second, by written statements which fully explained and fairly showed the true financial condition of the companies. The instruction might be interpreted as fitting defendant's testimony if the instruction were punctuated in this way: ". . . by furnishing her with statements which, explained fully and fairly, showed," etc.

The instruction, however, may not be so read. The instruction in effect said that if the jury should find the statements themselves fully explained and fairly showed the true financial condition, and defendant truthfully answered questions propounded, and offered to give further requested information, he discharged his duty.

The jury returned the following special findings of fact:

"1. Did Frances A. Hotchkiss go to the office of the defendant, Floyd Fischer, on or about the 13th day of January, 1927, and request him to tell her the financial condition of the Elmhurst Investment Company?  A. Yes.

"2. Did Floyd Fischer truly and fully disclose to the plaintiff the financial condition of the Elmhurst Investment Company? A. Yes, by showing financial statement as of December 31, 1926.

"3. Did the plaintiff ask the defendant while there at his office what was the value of her stock in the Elmhurst Investment Company? A. Yes.

"4. If you answer the foregoing question 'Yes,' state what he said was the value of the stock of the plaintiff in the Elmhurst Investment Company. A. Did not know.

"5. Did Floyd Fischer at any time state to the plaintiff what the total assets and liabilities of the company were in the Elmhurst Investment Company? A. Yes, by showing company's statement as of December 31, 1926.

"6. Did the defendant at the time the plaintiff called at his office in January, 1927, produce and exhibit to the plaintiff financial statements or balance sheets of the Elmhurst Investment Company and of the Orlando Petroleum Company showing the assets and liabilities of the two companies as of December 31, 1926? A. Yes.

"7. Was the defendant guilty of fraud in the purchase of the plaintiff's stock? A. No."

The jury did not find that defendant truly and fully disclosed to plaintiff the financial condition of the Elmhurst company by showing the statements and explaining them to plaintiff. Finding number 2 was that defendant truly and fully disclosed to plaintiff the financial condition of the company by showing her the financial statements. Even if it should be assumed that "showing" the financial statements meant showing the entries on the statements, the finding excluded the giving of information which was indispensable to full disclosure of true financial condition.

From the general verdict it must be assumed the jury found the statement of the assets and liabilities of the Elmhurst Investment Company, together with the statement of the Orlando company, fully and fairly showed the true financial condition of the Elmhurst company. It must also be assumed the jury found the other two elements of full and fair disclosure specified in the instruction—correct answers to such questions as the woman did ask, and offer to tell her anything else defendant knew which she might inquire about. But finding 2 was manifestly induced by the instruction, and finding 7 was based in part on findings 2, 5 and 6.

The instruction was fundamentally wrong. The director could not say to a shareholder: Here is the financial statement of the corporation; it shows these current and working assets of so much, these fixed assets of so much, these investments, etc.; shows these

current liabilities, shows this contingent liability, shows this surplus, etc.; and in that manner qualify himself as a purchaser of the shareholder's shares. Without being analyzed and interpreted the statement would convey little information respecting financial condition to a shareholder who did not acknowledge competency to interpret such a document. When interpreted the statement would reflect book value of shares. Book value might have little relation to market value and might have still less relation to actual value.

Whatever the jury might think after the statements had been explained to them by experts and had been supplemented by testimony tending to show that actual value of the shares approximated book value, it was impossible that the statements should show the true financial condition of the company, and the court was not authorized to submit to the jury the question whether they disclosed true financial condition.

The statement of the Elmhurst company did not even disclose true book value of shares. The stock of the Orlando company owned by the Elmhurst company was carried on the Elmhurst books at par. The book value of the Orlando stock was about $8 per share, or four times the par value. The first item of fixed assets on the Elmhurst statement, the Elmhurst building and theater, less depreciation, was $230,955.16. The building might in fact be a liability instead of an asset. There was testimony which showed it was earning more than 7½ per cent net per annum. The statement listed as assets bonds at cost to the amount of $288,454.10. Bonds of whom? Of some defunct subsidiary of some paper corporation? Or were the bonds readily convertible into cash? These three items constituted the bulk of the corporation's assets. Without information which the statement did not supply the statement alone meant little so far as true financial condition of the corporation was concerned.

In dealing with plaintiff for purchase of her shares defendant was not only required to disclose to her information relating to true financial condition of the company, but was also required to acquaint her with all material facts bearing on the transaction. His attention was directed to the subject of declaration of a dividend. Notwithstanding the form of plaintiff's inquiry, full and fair disclosure required summation by defendant of the information disclosed by the statements, and the furnishing of any other informa-

tion he possessed bearing specifically on the subject of likelihood of declaration of a dividend. The contingent tax liability was already charged against assets. Corporate stock was already charged against assets. Other liabilities except surplus were small. Large earning capacity was disclosed. The surplus charged against assets was very large. There was testimony that the bonds owned by the company were liquid assets. If these facts had been candidly presented in answer to the question whether a dividend would be declared, even a novice might have understood that declaration of a dividend would accord with sound business policy, which presumably the directors were pursuing. Instead of putting plaintiff in a position to judge whether a dividend would be declared, defendant stood on ignorance of what the board of directors might do.

Section 165 of the American Law Institute Restatement of the Law of Trusts reads as follows:

"Section 165. DUTY OF LOYALTY.

"(1) The trustee is under a duty to the beneficiary to administer the trust solely in the interest of the beneficiary.

"(2) The trustee, in dealing with the beneficiary on the trustee's own account, is under a duty to the beneficiary to deal fairly with him and to communicate to him all material facts in connection with the transaction which the trustee knows or should know." (p. 80.)

The comment to subsection 2 reads in part as follows:

"If the trustee acquires such an interest [interest of a beneficiary] with the consent of the beneficiary, the transaction cannot be set aside by the beneficiary if the beneficiary was not under an incapacity, and had knowledge of his legal rights and of all relevant facts which the trustee knew or should have known, and the transaction was fair and reasonable, and was not induced by the trustee by undue influence or other improper means to enter into the transaction. If any of these characteristics is lacking, however, the beneficiary can set aside the transaction." (p. 85.)

These principles are applicable to fiduciaries other than trustees, and the section states the rule supported by the weight of authority. The rule in this state is more strict.

When loyalty to a beneficiary and desire for personal gain on the part of the trustee may compete for supremacy as guides to conduct, this court does not permit the trustee to take the witness stand and tell how frank and fair he was in purchasing from the beneficiary. If the trust property be land, all too often valuable mineral resources are discovered as soon as the trustee acquires the interest of the beneficiaries, or he sells the land for twice what he paid for it.

If the trust property be bonds or stocks, as soon as the trustee acquires the securities the bonds promptly go to a premium or a melon is cut. Therefore this court applies to a trustee purchasing for himself from a beneficiary substantially the rule applied to an executor, administrator, or guardian, who purchases directly or indirectly for himself at a sale made in his representative capacity. A trustee's purchase may be avoided by the beneficiary, or the beneficiary may recover damages for his loss, on showing the sale and the relationship of the parties to it. (*Crowley v. Nixon*, 132 Kan. 552, and authorities cited, p. 557; 296 Pac. 376.) This rule is not applied because of any sophistication about the same person acting in two capacities in the same transaction, but because experience teaches such transactions too often result in gross fraud.

It is commonly said that directors of a corporation are "trustees" for stockholders. Accuracy of nomenclature need not be discussed. Directors act in a fiduciary capacity in management of corporate affairs, and a director negotiating with a shareholder for purchase of shares acts in a relation of scrupulous trust and confidence. The court deems it proper to withhold application of its rule relating to purchase of trust property by trustees proper, to purchase by a director of corporate shares, but such transactions must be subjected to the closest scrutiny, and unless conducted with the utmost fairness the wronged shareholder may invoke proper remedy.

Except with respect to the several particulars which have been noted, the instructions to the jury were adequate and correct. Since there must be a new trial, further discussion is unnecessary.

The judgment of the district court is reversed, and the cause is remanded with direction to grant a new trial.

---

### ELMHURST INVESTMENT COMPANY, TOPEKA, KANSAS.

GENERAL BALANCE SHEET AS AT DECEMBER 31, 1926.

*Assets.*

Current and working:
Cash in banks:

| | | |
|---|---|---|
| Citizens National Bank | $599.03 | |
| First National Bank | 2,412.07 | |
| Merchants National Bank | 10,899.82 | |
| Topeka State Bank | 5,442.64 | |
| | | $19,353.56 |
| Accounts receivable | | 1,173.79 |
| Bills receivable | | 35,000.00 |
| Inventory, oil in storage | | 271.47 |
| | | $55,798.82 |

Fixed assets:
Elmhurst building and Shubert theater ........ $303,000.00
Less depreciation ............................ 72,044.84
$230,955.16
Farm investment (oil leases).................... $148,599.12
Less: Depletion .................... $10,202.37
Depreciation ................ 54,738.92
Drilling costs .............. 81,510.29
146,451.58
2,147.54
Contracts:
Elmhurst "C" contracts ...................... $110.00
Elmhurst "D" contracts ...................... 1,402.00
1,512.00
Investments: Elmhurst "C" property........................ 605.22
Stocks and bonds:
Orlando Petroleum Co. ........................ $46,560.00
Bonds (cost) ................................ 288,454.10
335,014.10
$570,234.02
Deferred assets:
Prepaid insurance ........................................ $2,196.42
Prepaid interest ........................................ 64.90
Prepaid Kansas City ground rental........................... 3,125.00
5,386.32

Total assets .................................................... $631,419.16

## Liabilities.

Current liabilities: Accounts payable ...................................... $3,347.16
Dividends unclaimed .......................................... 864.98
Accruals: Taxes ............................................... 449.01
Contingent liability: Income tax............................................. 138,649.10
Deferred income:
Concordia lots ........................................ $110.00
Advance rental Shubert theater............................ 13,333.36
13,443.36
Capital and surplus:
Capital stock ............................................... 200,000.00
Surplus ........................................ $273,788.21
Less dividends paid .................... 40,000.00
$233,788.21
Surplus from operations, 1926:
January .................................... $2,545.04
February ................................... 5,303.72
March ...................................... 23,681.36
April ...................................... 3,013.54
May ........................................ 2,842.73
June ....................................... *1,193.74*
July ....................................... 2,569.99
August ..................................... 7,354.14
September .................................. 895.51
October .................................... *2,826.19*
November ................................... 6,246.77
December ................................... 1,846.95
$52,279.82
Less: Loss a/c defalcation, K. C.
building manager ......... $2,750.00
Depletion on cost ............. 40.31
Depreciation ................. 7,575.00
Inventory, oil in storage...... 139.15
Taxes, general .............. 898.02
11,402.48
Earned surplus ................................. 40,877.34
Total earned surplus, all years............................... 274,665.55

Total liabilities ................................................ $631,419.16

## ORLANDO PETROLEUM COMPANY, TOPEKA, KANSAS.

### GENERAL BALANCE SHEET AS AT DECEMBER 31, 1926.

*Assets.*

| | | | |
|---|---|---|---|
| Current and working: | | | |
| Cash in banks: | | | |
| Merchants National Bank | $29,205.32 | | |
| National Bank of Topeka | 11,791.24 | | |
| Peabody State Bank | 2,961.20 | | |
| Topeka State Bank | 5,529.61 | | |
| | | $49,487.37 | |
| Accounts receivable | | 10,347.71 | |
| Bills receivable | | 50,000.00 | |
| Inventory, oil in storage | | 1,671.72 | |
| Notes receivable | | 192.37 | |
| Warehouse account | | 10,677.02 | |
| | | | $122,376.19 |
| Investments: Bonds (cost) | | | 237,737.91 |
| Fixed assets: | | | |
| Farm investment (oil leases) 1 | $1,265,495.05 | | |
| Less: Depreciation | $473,540.87 | | |
| Drilling costs | 761,543.15 | | |
| | 1,235,084.02 | | |
| | | $30,411.03 | |
| Drilling tools | $2,137.71 | | |
| Less depreciation | 1,966.94 | | |
| | | 170.77 | |
| Automobiles | $11,216.05 | | |
| Less depreciation | 8,815.61 | | |
| | | 2,400.44 | |
| Live stock and equipment | $998.05 | | |
| Less depreciation | 905.32 | | |
| | | 92.73 | |
| Steam plant investment | $18,541.30 | | |
| Less depreciation | 17,587.67 | | |
| | | 953.63 | |
| Telephone line | $652.08 | | |
| Less depreciation | 567.32 | | |
| | | 84.76 | |
| Water station investment | $38,490.49 | | |
| Less depreciation | 37,231.67 | | |
| | | 1,258.82 | |
| Boiler and total account, general | $2,759.30 | | |
| Less depreciation | 2,384.07 | | |
| | | 375.23 | |
| Inactive leaseholds | | 3,693.34 | |
| | | | 39,440.75 |
| Deferred assets: | | | |
| Prepaid interest | | $204.87 | |
| Prepaid insurance | | 1,263.53 | |
| Surplus, insurance deposit premium | | 422.65 | |
| | | | 1,891.05 |
| Total assets | | | $401,445.90 |

*Liabilities.*

| | | | |
|---|---|---|---|
| Current liabilities: | | | |
| Accounts payable | | $3,963.85 | |
| Pay rolls and pay orders (wages due) | | 1,832.77 | |
| | | | $5,796.62 |
| Accruals: Taxes | | | 1,597.69 |
| Contingent liability: Income tax | | | 112,248.53 |
| Capital and surplus: | | | |
| Capital: | | | |
| Capital stock authorized | | $100,000.00 | |
| Less unissued stock | | 6,880.00 | |
| Issued and outstanding | | | 93,120.00 |
| Surplus | | $149,505.01 | |
| Less dividends paid | | 46,560.00 | |
| | | 102,945.01 | |

Surplus from operations, 1926:

| | |
|---|---|
| January | $9,075.27 |
| February | 9,896.77 |
| March | 10,717.77 |
| April | 7,321.95 |
| May | 12,846.39 |
| June | 4,751.07 |
| July | 4,836.17 |
| August | 18,279.49 |
| September | 9,572.39 |
| October | 9,451.87 |
| November | 10,023.83 |
| December | 6,149.69 |

$112,922.66

| | | |
|---|---|---|
| Less: Drilling costs | $17,694.41 | |
| Inventory, oil in storage... | 1,664.21 | |
| Surrendered leases | 4,422.52 | |
| Taxes, general | 3,403.47 | |
| | | 27,184.61 |

Earned surplus ........................... $85,738.05
Total earned surplus, all years..................... $188,683.06

Total liabilities .............................................. $401,445.90