**R. L. THOMPSON et al., Appellants,**

v.

**L. N. HAMBRICK et al., Appellees.**

No. 18268.

Court of Civil Appeals of Texas, Dallas.

April 4, 1974.

Rehearing Denied May 2, 1974.

---

Jay M. Vogelson, Steinberg, Generes, Luerssen & Vogelson, Dallas, for appellants.

Sandy M. Sandoloski, Weinberg, Sandoloski & Hines, Dallas, for appellees.

BATEMAN, Justice.

The appellants were the minority shareholders, and appellees were the majority shareholders, in the American Bank and Trust of Irving, Texas, which was organized in early 1969. The appellants were plaintiffs in the trial court and now appeal from a take-nothing summary judgment. The parties will be designated as they were in the trial court.

Plaintiffs' first claim for relief is that the defendants, owning the majority of the shares of stock, and hence control, of the bank, sold their shares to Dr. B. J. Case and B. M. Grantland at a price nearly twice its market value, in violation of a written agreement dated February 4, 1969 between L. N. Hambrick and B. H. Buchanan as "Trustees" on the one hand, and

each individual shareholder, referred to therein as "Stockholder," on the other hand, in pertinent part as follows:

Whereas, Stockholder is one of several persons who, collectively, own 100% of the existing outstanding capital stock of the American Bank and Trust Company of Irving, Texas, hereinafter referred to as Bank; and

Whereas, Stockholder recognizes that it is to his advantage and to the mutual advantage of all other stockholders for the stock of Bank to remain, insofar as possible, within the exclusive control of the existing stockholders during the first five (5) years of Bank's existence, in order to insure its proper management and growth; and

Whereas, all of the stockholders of Bank mutually desire to enter into this Agreement, by which each stockholder grants unto L. N. Hambrick and B. H. Buchanan, Trustees, for a period of five (5) years from the date of this Agreement, the right of first refusal to purchase the stock of any stockholder who may desire to sell his stock . . . at such price as would be determined in accordance with this Agreement;

Now, therefore, it is mutually covenanted and agreed by and between the parties hereto that, in consideration of the mutual promises, considerations and agreements contained herein, and in consideration of the execution of a similar agreement by other presently existing stockholders, the following conditions shall apply:

1. Stockholder shall neither sell nor assign to any person, firm, partnership or corporation any of his stock in American Bank and Trust Company, until he has first offered the same, in writing, to L. N. Hambrick and B. H. Buchanan, Trustees.

.    .    .    .    .    .

Then followed a formula for determining the price at which the "Trustees" shall buy the stock so tendered to them, and other provisions not necessary to set out here in full.

In the spring of 1971, Dr. B. J. Case and B. M. Grantland became interested in buying all of the stock of the bank, or at least enough to assure them of control. Their previous offer to buy the stock at $45 per share was rejected. Thereafter Buchanan .met Case at the Los Colinas Country Club and negotiated a sale to Case and Grantland of sufficient shares to assure control, the price agreed upon being $55 per share. At about this time Buchanan purchased 900 shares from the plaintiff William A. Wylie, one of the officers of the bank, at $40 per share. Case offered to buy defendants' stock at $55 per share. Defendants accepted and 16,203 shares were sold. The defendants then resigned from the board of directors.

Plaintiffs alleged that the said agreement of February 4, 1969 is ambiguous in that it does not state for whose benefit the defendants Hambrick and Buchanan agreed to act as trustees, or their obligations if a conflict of interest should arise. They prayed that the court should hear parol evidence by which to determine the intention of the contracting parties, and to declare that (a) Hambrick and Buchanan were and are trustees under the contract for the benefit of all the other shareholders, and (b) that Hambrick and Buchanan were disqualified and should have recused themselves from acting under the agreement with respect to stock owned by them.

Plaintiffs' first four points of error, in varying phraseology, say the trial court abused its discretion in not holding the agreement to be ambiguous and in refusing to hear parol evidence as to its meaning in the light of surrounding facts and circumstances. They claim that they collectively had the right under the agreement, if properly interpreted, of first refusal of the stock of the defendants, including Hambrick and Buchanan, that the purpose and intent of the agreement was to give all

shareholders the right to buy the stock of any of them who wanted to sell their stock.

Defendants contend, on the other hand, that the agreement could only have been intended for the benefit and protection of Hambrick and Buchanan. The instrument does not provide what the corpus of the "trust" was, nor who the beneficiaries were. Neither does it provide for the source of the funds that would be used to purchase the shares on behalf of the "trust." The agreement itself indicates that it is designed to serve "the mutual advantage of all other stockholders," but this is inconsistent with the argument that it was for the sole benefit of Hambrick and Buchanan. Parol evidence of circumstances surrounding the making of a contract is admissible to explain and resolve these ambiguities. 2 C. McCormick and R. Ray, Texas Law of Evidence § 1685 (2d ed. 1956); Page v. Marshall, 347 S.W.2d 656, 658 (Tex.Civ.App.—Austin 1961, no writ). Where there is a question as to the true meaning of an ambiguous instrument, summary judgment based thereon is improper. Robert v. E. C. Milstead Ranching, Inc., 469 S.W.2d 429 (Tex.Civ.App.—Beaumont 1971, writ ref'd n.r.e.); Tinnin v. Crook, 333 S.W.2d 617 (Tex.Civ.App.—El Paso 1960, writ ref'd n.r.e.).

We cannot say that the summary-judgment evidence establishes as a matter of law that the agreement was for the exclusive benefit of Hambrick and Buchanan and gave them the right to sell their stock without giving the other shareholders an opportunity to buy the same either at a price determined by the formula or at the same price that had been offered for it. We therefore sustain the first four points of error.

Whether plaintiffs have alleged the correct measure of damages to which they will be entitled if it be found that the agreement means what they say it means is not before us. We merely hold that defendants have not carried their negative burden of showing as a matter of law that in that event there are no fact issues which, if resolved in favor of plaintiffs, will entitle them to damages.

By their fifth point of error plaintiffs contend that, quite aside from the said written agreement, the defendants owed to them a fiduciary duty which was breached, and that the trial court erred by not so finding. In their sixth point they say the court erred in not finding that the premium paid for controlling shares was a corporate asset in which they were entitled to share pro rata.

The plaintiffs rely largely upon Perlman v. Feldmann, 219 F.2d 173 (2d Cir. 1955), cert. denied, 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277; Jones v. H. F. Ahmanson & Co., 1 Cal.3d 93, 81 Cal.Rptr. 592, 460 P.2d 464 (1969); and International Bankers Life Inc. Co. v. Holloway, 368 S.W.2d 567 (Tex.1963).

*Feldman* was a derivative action brought by minority stockholders of a steel company to compel an accounting for and restitution of allegedly illegal profits made by Feldman, the dominant shareholder, chairman of the board and president of the steel company, in selling his stock to another corporation which sought control of the steel company in order to assure itself of a continuing supply of steel in a time of shortage. The court held that the sale by Feldman of the controlling stock was a breach of fiduciary duty in that it foreclosed the steel company's opportunity to expand, of which the minority stockholders had just cause to complain. While recognizing that a majority stockholder may normally dispose of his stock to outsiders without having to account to the corporation for profit, the court held that he is accountable to the minority stockholders under the particular circumstances of that case.

*Feldman* involved more than the acquisition of mere control; it also involved the frustration of a corporate business opportunity to the detriment of the minority stockholders. In this respect it differs from the case at bar. The right of control is ordinarily a right inherent in ownership or control of a majority of the stock, and

if a purchaser pays a premium; i. e., a price greater than the fair value of the stock, merely for the right of control as an investment, with no foreseeable looting and no appropriation or frustration of a corporate business opportunity, and no inherent unfairness to the minority shareholders, it is our view that the minority stockholders have no right to share in such premium unless the said written agreement should be interpreted to give them such a right.

As said in Tryon v. Smith, 191 Or. 172, 229 P.2d 251, 254 (1951):

> It is generally held that majority stockholders may sell their stock at any time and for any price obtainable without informing other stockholders of the price or terms of sale, provided they act in good faith . . . The fact that Smith et al. received more for their stock than the minority is no evidence of fraud, since it is generally recognized that the stock of majority stockholders is of more value than that of the minority.

To the same effect, see Levy v. American Beverage Corp., 265 App.Div. 208, 38 N.Y.S.2d 517 (1942); Bart v. Pine Grove, Inc., 326 Ill.App. 426, 62 N.E.2d 127 (1945); McDaniel v. Painter, 418 F.2d 545 (10th Cir. 1969).

However, as said in McDaniel v. Painter, *Id.* at 547:

> Thus, when transferring control of the corporation, the managing majority are dutybound not to sell controlling interest to outsiders if the circumstances surrounding the proposed transfer would alert suspicion in a prudent man that the purchasers are an irresponsible group who will mismanage and loot the corporate assets.

Jones v. H. F. Ahmanson & Co., *supra,* does appear to expand legal thinking on the scope of the controlling shareholder's responsibility in such cases. This was a class action brought by a minority stockholder against a holding company and majority stockholders of a savings and loan association for breach of fiduciary responsibility. The book value of the association stock was very high and there was no public market for the stock. However, there developed a bull market in savings and loan associations, due to an upsurge in investor interest in such associations generally. The defendants, who were officers and directors of the association and held 85% of its stock, formed a holding company and exchanged each of their shares in the association for two hundred and fifty shares of the holding company's stock. No opportunity for such exchange was offered to the minority stockholders. This arrangement created a public market for the shares of the majority in the holding company, but the minority were denied this advantage. Although it was stipulated that no harm had been done to the association, the Supreme Court of California held that the controlling shareholders could not use their power to control the corporation for the purpose of promoting a marketing scheme which benefited themselves alone to the detriment of the minority, and that the minorities' pleading stated a cause of action for a sharing in the profits thus made by the defendants.

In International Bankers Life Ins. Co. v. Holloway, 368 S.W.2d 567 (Tex.1963), the corporation itself sued several of its former officers and directors, alleging that they had violated their fiduciary duties by selling their stock in direct competition to a new offering by the corporation. Holding that this act constituted the appropriation of a corporate opportunity, the Supreme Court of Texas held that directors of a corporation, being fiduciaries, owe to the corporation the responsibility of their uncorrupted business judgment for the sole benefit of the corporation; that they owed the corporation the duty to exert all efforts in its behalf to the end that the sale of its stock would net the corporation the greatest possible return and that under the circumstances of this case the burden was on the defendants to establish the fairness to the corporation of their personal sales transactions.

The rule applicable here is stated in Seagrave Corp. v. Mount, 212 F.2d 389, 395

(6th Cir. 1954), where the court, after stating the general rule that majority stockholders are at liberty to sell their shares at any time and for any acceptable price without being liable to other stockholders added this:

However, there are recognized exceptions to the general rule, such as where fraud is involved in the actions of the dominant directors and stockholders, where controlling stockholders turn over their shares to purchasers who mismanage the corporation or loot the corporate assets, (where non-controlling stockholders are induced to sell their shares by concealment of the fact that a premium is to be paid to the controlling stockholders,) where controlling stockholders or directors make a secret profit from the transaction, or where directors are dealing directly with the corporation to their own personal advantage, known or unknown.

■ In summary, it is our opinion that a majority stockholder who is paid a premium for his stock because of the control that goes with it is under no duty to the corporation or to the minority stockholders to account for such additional profit, unless he has reason to suspect that the purchaser will loot the corporation, or some part of the premium he receives for his stock is in consideration of a business opportunity, as in *Feldman,* or unless the seller's conduct runs afoul of the principles contained in the following language from *Holloway, Id.,* 368 S.W.2d at 577:

A corporate fiduciary is under obligation not to usurp corporate opportunities for personal gain, and equity will hold him accountable to the corporation for his profits if he does so. Transactions in which a corporate fiduciary derives personal profit, either in dealing with the corporation or its property, or in matters of corporate interest, are subject to the closest examination and the form of the transaction will give way to the substance of what actually has been brought about. One court has commented that a

director of a corporation is held "in official action, to the extreme measure of candor, unselfishness, and good faith. Those principles are rigid, essential, and salutary." Kavanaugh v. Kavanaugh Knitting Co., 226 N.Y. 185, 123 N.E. 148.

It appears from the summary-judgment evidence that the defendants, shortly after joining in the rejection of the $45 per share offer, made a secret agreement to sell their stock at $55 per share to the same people who had made the previous offer, without notice to the minority shareholders and giving them neither the right of first refusal nor any participation whatever in the transaction. This indicates rather clearly the presence of fact issues as to the alleged breach of fiduciary duty.

■ By their seventh point of error appellants assert that the court erred in holding there was no question of fact raised as to whether the defendant Buchanan had improperly coerced the plaintiff Wylie, with the threat of job loss to sell his nine hundred shares at $40 per share immediately prior to the time that Buchanan sold such shares for $55 per share. We find no evidence in the record that Buchanan threatened Wylie with loss of his job if he failed to sell his stock at $40 per share; in fact, Wylie seems by his testimony to have assumed that with the change of control of the bank, he would lose his job in any event. Moreover, he testified in his deposition that he sold his stock at a profit of $14.50 per share and that it was to his advantage to do so. It also appears from his own testimony that he was not coerced into selling his stock. Defendants carried their burden under Texas Rules of Civil Procedure rule 166–A of showing the absence of a material fact issue as to Wylie's said claim and that defendants were entitled to judgment as a matter of law. Therefore, the seventh point is overruled and the summary judgment denying Wylie's claim is affirmed.

By their eighth point of error, appellants contend there was a fact issue as to whether the fair market value of their shares

was lowered as a consequence "of the precipitous sale of control by defendants and their precipitous resignation en masse from the board of directors." Since the case must be tried, we deem it improper for us to comment or pass upon this point of error.

For the reasons hereinabove given, the judgment is reversed and remanded in part and affirmed in part.