(571 P.2d 17)

No. 48,580

J. Proctor Ritchie; H.D. Ritchie; E. D. Ritchie; Barbara Mary Ritchie; H.D. Ritchie, as Natural Guardian for Mary Martha Ritchie and Edward Charles Ritchie; and E.D. Ritchie, as Natural Guardian for Julie Ritchie, Jan Ritchie and Jack Davis Ritchie, *Appellants,* v. Robert V. McGrath; Virgil S. Browne, Jr.; Henry W. Browne; Deborah Lee Browne; E.B. Shawver; Jerry E. Shawver; Stelbar Oil Corporation, Inc.; and Boulevard State Bank, *Appellees.*

Petition for review denied September 12, 1977.

Opinion filed July 22, 1977.

*Robert Martin* and *Larry B. Spikes* of Martin, Pringle, Schell & Fair, of Wichita, for the appellants.

*Donald R. Newkirk* and *Gerrit H. Wormhoudt* of Fleeson, Gooing, Coulson & Kitch, of Wichita, for the appellee, Robert V. McGrath.

*Robert L. Howard* and *James M. Armstrong* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, for the appellees, Virgil S. Browne, Jr., Henry W. Browne, E.B. Shawver, Jerry E. Shawver, and Stelbar Oil Corporation, Inc.

Before SPENCER, P.J., ABBOTT and SWINEHART, JJ.

SPENCER, J.: Initially commenced as a class action and a derivative action pursuant to K.S.A. 60-223 *et seq.,* an order of dismissal was entered as to certain original defendants and this case devolved into a suit wherein plaintiffs, as minority shareholders, seek to recover a proportionate share of a premium received by defendants in the sale of capital stock representing the controlling interest in the Boulevard State Bank, Wichita, Kansas. At the trial level, judgment was entered for the defendants and plaintiffs have appealed.

The Boulevard State Bank was organized in 1953. Members of the Ritchie family, plaintiffs herein, and of the Browne and

Shawver families, defendants herein, were among the original shareholders. The defendant McGrath was employed April 11, 1968, as president of the bank and chairman of its board of directors and served as such at all times material herein. The defendant Jerry E. Shawver is a director, and the defendant Virgil S. Browne, Jr., who was one of the original incorporators, had served as a director of the bank until 1961, after which time he served only in an advisory capacity to the board. Plaintiff E. D. Ritchie had served on the board of directors until January, 1974, at which time he retired from the board.

At the time of organization, no single individual owned a majority of the bank stock issued and outstanding, but in 1968 the Browne-Shawver interests, including stock held by Stelbar Oil Corporation, Inc. controlled by the Shawver family and that owned by McGrath, collectively held approximately thirty-eight percent of the outstanding shares. Late in 1969 and in 1970, Virgil S. Browne, Jr. and Jerry E. Shawver, who had other business interests together, discussed the possibility of buying control of the bank as each already "had so much stock . . . and there was such a small market for it" at that time. They decided to include the defendant McGrath in their plan because they believed that McGrath would have more "staying power" as the manager of the bank if he was financially tied to the bank by greater stock ownership. McGrath was contacted and it was determined that the group, including all Browne and Shawver family shareholders and McGrath, needed an additional 6,500 shares to obtain a majority of the issued stock. It was then orally agreed that McGrath would purchase enough shares to bring his total holdings to 3,750 shares and that the Browne-Shawver interests would purchase the remainder, after which they would enter into an agreement to pool their interests. There were then 75,000 shares of capital stock issued and outstanding. McGrath acquired his additional stock during the year 1970, his last acquisition of 2,403 shares being on October 14, 1970.

On October 14, 1970, the shares necessary to constitute a majority had been acquired and on that date the defendants, then collectively possessed of 38,142 shares of the stock, executed an instrument in writing entitled "Pooling Agreement" whereby it was agreed that they would thereafter vote their respective stockholdings in the bank as a unit at any and all meetings of the

stockholders for whatever purpose. This agreement was to continue for a period of ten years unless terminated or extended by mutual consent of the parties. It contained an option to purchase the stock of any party to the agreement wishing to sell, and other ordinary provisions. It is to be noted that neither the original oral agreement to purchase additional shares of stock for the purpose of acquiring a controlling interest nor the subsequent written pooling agreement was at any time prior to the sale disclosed to other shareholders or to the other directors. Notwithstanding the pooling agreement, each of the parties to that instrument continued thereafter to vote his stock individually and there is nothing in the record to indicate that any other provision of their written agreement was exercised in any manner.

McGrath testified that perhaps two or three times a year he received inquiries from persons indicating an interest in buying control of the bank, which he would sometimes discuss with Shawver and Browne; but that in 1972, he had been approached by a "local group" interested in buying the controlling interest. This was discussed with Browne and Shawver and, as one result, a price of $80 per share was placed on their stock. That deal did not materialize.

By 1973 the defendants then collectively in control of a majority of the stock of the bank were seriously interested in selling. With McGrath acting for himself and as intermediary for his co-defendants who were parties to the pooling agreement, negotiations were undertaken in response to an earlier inquiry to sell the controlling interest in the bank. This culminated in the execution of a contract under date of June 19, 1974, for the sale of 38,042 shares of stock by the defendants and certain others to James H. Hentzen and Gaylon M. Lawrence at the price of $80 per share. The contract provided for a down payment of $15,000 to be retained by the sellers in full payment of liquidated damages in the event the buyers did not complete the purchase. It also contained the usual representations and warranties by the sellers and provided to the buyers access to the books and records of the bank during normal business hours, with the provision that the buyers pay any expenses incurred by them for services of counsel, accountants or otherwise in connection with the agreement, and that sellers pay any and all such expenses incurred by them in the same connection. As a part of this transaction, the sellers re-

quested and the buyers agreed that the purchase include 2,956 shares owned collectively by James T. Klepper, a bank director who had been encouraged by Virgil S. Browne, Jr. to buy stock, Bertrand M. Lester, Jr., a longtime Shawver family employee who had been assured that if the Shawvers sold their stock his would be included, the vice president of the bank and his wife, and the Browne and Shawver children. This was accomplished when it was agreed that McGrath would reduce the number of shares to be sold by him in the original agreement by the 1,450 shares owned by James T. Klepper. The sale was finalized on November 27, 1974.

The other bank directors were not informed of the sale until the day before the transaction was closed, and the only one of the plaintiffs who received such notice was E. D. Ritchie, who was orally informed of the sale by Jerry E. Shawver. Following this transaction, each of the defendants paid McGrath the sum of $1 per share of their stock sold for his services in connection with the sale.

Prior to closing and pursuant to the terms of the purchase agreement, Hentzen and Lawrence were given access to the bank's records for an investigation of its financial condition. An accountant's bill of $17,500 was incurred in this activity. Following the closing, Hentzen suggested to McGrath that since the audit was generally helpful to the bank, that expense might be paid by the bank. McGrath agreed and the bank made payment of that bill. After this suit was filed, Hentzen and Lawrence reimbursed the bank for that expense.

At the January, 1975, shareholders' meeting, Hentzen and Lawrence were added to the board of directors. In response to questions about the sale, McGrath refused to reveal the price paid for the controlling block shares or the amount of the gratuity or commission paid to him in connection with the sale of that stock. McGrath was retained as president of the bank at an increase in salary.

Prior to closing under the sale and purchase contract with the defendants, Hentzen and Lawrence formed a one-bank holding company for the purpose of taking advantage of certain provisions of the Internal Revenue Code. Following their purchase of the controlling stock interests, these parties sought to acquire the remaining shares and the result was that plaintiffs sold all of their

stock in the bank to Hentzen and Lawrence for the sum of $50.20 per share, which amount then represented the book value of the bank stock.

This action was commenced February 26, 1975. In their second amended petition, which was filed September 29, 1975, plaintiffs joined Hentzen, Lawrence, their holding company, and the Boulevard State Bank as defendants, but the action was dismissed as to those defendants on motion of the plaintiff under date of September 30, 1975. Plaintiffs contend that they are entitled to participate in the approximately $30 per share premium paid to the defendants. This case was tried to the court and on December 13, 1975, the court made rather extensive findings of fact and conclusions of law, which are in part as follows:

"The Court finds that the bank has prospered over that time under the president and chairman of the board, Mr. McGrath . . . .

"There is no competent evidence that the Defendants, any of the Defendants acquired any of this stock subject to the agreement and, specifically the four purchases of stock, other than through fair prices for the stock. The stock was purchased at arm's length transactions from the four individuals or four transactions and the Court finds from the evidence that there was no misrepresentation or interference or anyone attempting to mislead these people in selling the stock. There is no wrongful conduct.

"The Defendants made reasonable inquiry as to the buyers discovering that they owned two other banks in Kansas and the banks had prospered after they had bought them and that there is no evidence to what extent they must go but a reasonable inquiry which was done and that the people, the buyers were responsible persons of good character and reliability.

"The Court further finds that there is no fraud or misuse of any type or looting or siphoning off for personal gain to the corporation and the stockholders and any wrongful appropriation of corporate assets. To condemn the kind of transaction here would strongly tend to discourage stock investment and be a menace to efficient operations of any corporate business.

"The Court further finds that the Defendants were entitled to pay the Defendant McGrath their gratuity for assisting them in the sale of the stock. No breach of any duty owed either to Plaintiffs, other shareholders of the bank, or to the bank itself, resulted from this voluntary payment to the Defendant McGrath when it was conceived after McGrath had successfully negotiated the stock sale."

Plaintiffs argue that the trial court erred in failing to find that as officers and directors of the corporation defendants violated their fiduciary obligation to all stockholders. The acts which they claim constitute a breach of fiduciary duty are (1) the acquisition of control, the pooling agreement effecting such control, and

failure to disclose each; and (2) failure to disclose the offers to purchase a controlling block of stock. Plaintiffs' position appears to be that the premium defendants received in the sale of their controlling stock was a result of these alleged breaches of fiduciary duty and that plaintiffs, as minority shareholders, should share proportionately in that premium. As an alternative, plaintiffs argue that sale of controlling stock at a premium was a sale of a corporate asset belonging to all shareholders.

"Corporate directors and officers are under a very strict fiduciary duty in their relations both to the corporation and to its shareholders." (*Sampson v. Hunt,* 222 Kan. 268, Syl. 1, 564 P.2d 489.) See also *Parsons Mobile Products, Inc. v. Remmert,* 216 Kan. 256, 531 P.2d 428. Accordingly, a majority shareholder who is a director or officer may be held accountable in the sale of majority stock if the circumstances surrounding the proposed transfer would alert suspicion in a prudent person that the purchasers are an irresponsible group who will mismanage and loot the corporate assets. *McDaniel v. Painter,* 418 F.2d 545, 547 (10th Cir. 1969); *Harman v. Willbern,* 520 F.2d 1333, 1334 (10th Cir. 1975). Breaches of duty have also been found in sales involving "fraud, misuse of confidential information . . . siphoning off for personal gain of a business advantage rightfully belonging to the corporation and shareholders in common, or wrongfully appropriating corporate assets." *McDaniel v. Painter,* supra, at 548. In addition, where an officer or director negotiates a sale of stock where incumbent directors and officers are to resign so to effect a sale of the entire corporation, acts of the directors or officers compelling minority shareholders to sell their shares on terms which personally benefit the directors or officers, may be breaches of fiduciary duty. See *Delano v. Kitch,* 542 F.2d 550 (10th Cir. 1976).

In support of their argument that the defendants owed a duty to disclose the acquisition of control, the pooling agreement, and the offers of purchase, plaintiffs point to *Hotchkiss v. Fischer,* 136 Kan. 530, 16 P.2d 531; *Stewart v. Harris,* 69 Kan. 498, 77 Pac. 277; and *Blazer v. Black,* 196 F.2d 139 (10th Cir. 1952). However, as plaintiffs recognize, these cases deal with purchases or sales of stock by an officer or director from or to a shareholder. Kansas has consistently recognized the fiduciary duty of the corporate officer or director to disclose pertinent information in such a situation.

See *Sampson v. Hunt,* supra. As explained in *Blazer v. Black,* supra:

". . . [T]here are cogent reasons for applying that rule · 'ᵢere the officers and directors of the corporation have peculiar knowledge of the condition and affairs of the Company—knowledge and information which is not readily available or imparted to the stockholders." (196 F.2d at 146.)

In this instance, none of the plaintiffs sold their stock to the defendants and those shareholders who did so during the period the defendants were seeking control have not joined in this action. Plaintiffs expressly state that no complaint is made regarding those sales and purchases "except insofar as such secret purchases fit into the overall wrongful conduct of the defendants." The trial court specifically found that such stock was purchased at "arm's length transactions," and there was "no misrepresentation or interference or anyone attempting to mislead these people in selling the stock. There is no wrongful conduct."

As to the claimed breach of fiduciary duty in the present case, it appears that no such breach can be found in the defendants' acquisition of control. As just noted, the purchases of stock with which defendants gained control are not questioned, and it has further been said that "[t]here is no rule of law which prevents one or more persons from purchasing a majority of the shares of a corporation for the purpose of acquiring control thereof. . . ." 18 C.J.S. Corporations, § 496, p. 1174. Plaintiffs cite no authority and we find none that such individual purchases of stock, even though motivated by a desire to gain control, are in any way invalid if accomplished in secrecy.

The defendants as a group gained control by their individual purchases of stock and by pooling their shares into a voting block. The provisions of the pooling agreement are not in issue and there is nothing in the record showing the agreement to be an invalid voting trust. The legality of the agreement must be conceded. See K.S.A. 17-6508(c) and the Kansas comment thereto; *Wallace v. Southwestern Sanitarium Co.,* 160 Kan. 331, 161 P.2d 129; Hecker, "Close Corporations and the Kansas General Corporation Code of 1972," 22 Kan. L. Rev. 489 at 490-499; Annotation, 45 A.L.R.2d 799. We hold that defendants violated no fiduciary duty by acquiring control or entering into a pooling agreement or in failing to disclose such facts to plaintiffs.

As to failure to disclose offers to purchase a majority of the stock, it must be kept in mind that since the defendants had already validly obtained a majority of the stock, any such offer must necessarily have been directed to them by virtue of such ownership. This is so even though the purchaser was willing to accept any combination of sellers to meet his majority offer. The pooling agreement, by containing a purchase-option provision, had preempted any offer to buy a majority of the stock.

In *Haberman v. Murchison,* 331 F. Supp. 180, 188 (S.D.N.Y. 1971), aff'd 468 F.2d 1305 (2d Cir. 1972), it was said in the context of the federal securities laws:

". . . The Court rejects the theory, not accepted by the Courts, that knowledge of an offer to buy a dominate shareholder's stock is 'inside information' which must be shared with all other shareholders. . . ."

*McDaniel v. Painter,* supra, involved a claim of breach of fiduciary duty upon the sale of their shares by two brothers who held majority stock interest in a Chanute, Kansas, bank. The claims of breach were failure to disclose the offer of purchase and the sale at a price not available to minority shareholders. Judge Hill stated:

". . . The universally accepted rule was stated by this court in Roby v. Dunnett, 88 F.2d 68, 69 (10th Cir. 1937): ' * * * [E]very stockholder, including a majority holder, is at liberty to dispose of his shares at any time and for any price to which he may agree without being liable to other stockholders * * * as long as he does not dominate, interfere with, or mislead other stockholders in exercising the same rights.' . . ." (418 F.2d at 547.)

"The fact that controlling stock sells for more than book value, as it did here, is not evidence of fraud since it is generally recognized that majority stock is more valuable than minority stock. Neither is there merit in the argument that appellees, as dominant shareholders, must refrain from receiving a premium which reflects the control potential of the stock. . . ." (418 F.2d at 548.)

Plaintiffs seek to distinguish *McDaniel* on the basis that in that case there was "no showing that the sellers combined or acted in secret or that the position or office of the president of the bank was used to intercept and control opportunities to sell stock . . . ." The objection that the defendants here combined in secret has been previously dealt with. *McDaniel* approved the "confidential nature of the transaction" there involved, *i.e.* nondisclosure of the offer or the sale. The opportunity to sell stock which was intercepted by McGrath in the present case was an offer to buy a majority of the stock, a quantity which

the defendants had already validly acquired. We hold that defendants violated no duty in not disclosing to the plaintiffs the offer to purchase a majority of the stock.

We adhere to the rule that corporate directors and officers are under a very strict fiduciary duty in their relations both to the corporation and its stockholders, but where is the breach of that duty in this case?

This is not a case where an officer or director, with undisclosed knowledge of information affecting the value of stock, goes about buying up shares from minority shareholders, which he in turn sells at a profit. Here, the shares sold were already owned at the time of the offer to purchase, and those shares were not acquired from any of the plaintiffs. Nor is there any showing that the sale by defendants of their stock or the failure to disclose the sale or the offer therefor in any way coerced plaintiffs into selling their stock or affected the value of that stock. When the plaintiffs sold their shares almost a year after the sale by defendants, they did so at full book value.

As has been noted, the dominant shareholder must not sell his stock if circumstances would put the seller on guard that the purchasers are irresponsible, or likely to mismanage and loot the corporation. Here, the trial court found that the defendants inquired as to Hentzen and Lawrence and found them reputable and that the bank continued to prosper after the sale of stock to them. That finding is not challenged.

We find no evidence here of fraud against the plaintiff minority shareholders. We adopt the rule expressed in *McDaniel* that the fact that controlling stock sells for more than book value is not per se indicative of fraud since controlling stock is necessarily more valuable than minority stock. The fact that controlling shareholders may stand in a fiduciary position to minority shareholders, either as officers and directors or even as majority shareholders, does not require them to share a premium received in the sale of their stock, if the premium is paid only for the potential for control inherent in the stock, and not by reason of a breach of fiduciary duty by the selling shareholders. See Annotation, 38 A.L.R.3d 738.

After entering into their contract of June 19, 1974, the defendants invited James T. Klepper and certain others who were minority shareholders to join in the sale at the premium price

without disclosing the facts of that sale to any of the other minority shareholders. In *Stanton v. Schenck,* 140 Misc. 621, 251 N.Y.S. 221 (1931), it was specifically held that a majority shareholder could include some minority shareholders in the sale and not others. Generally, there is no obligation in one group of stockholders to invite participation of other stockholders at a price above market value on a theory of share and share alike. *Haberman v. Murchison,* 468 F.2d 1305 (2d Cir. 1972). See also *Tyron et al. v. Smith,* 191 Ore. 172, 229 P.2d 251 (1951); *Thompson v. Hambrick,* 508 S.W.2d 949 (Tex. Civ. App. 1974).

We note that Hentzen and Lawrence were given access to the bank's records for the purpose of an audit. McGrath later authorized payment of the accounting bill for this from bank funds. That bill was subsequently repaid and the breach of fiduciary duty, if any, would go to the bank and not to the plaintiffs. Here, we take note of evidence to the effect that an independent audit of the affairs of the bank had been recommended and the audit for which the bill was rendered was deemed to have been of benefit to the bank, and conclude that even though payment by the bank may have been improper, no harm resulted to plaintiffs from this action.

We conclude that there was not a breach of fiduciary duty of the defendants as officers, directors, or dominant shareholders in the manner in which they acquired their additional shares, nor in pooling their interests to provide a controlling interest, nor in failing to disclose their objectives in purchasing stock or their pooling agreement, nor by inviting some but not all of the minority shareholders to join with them in a sale at a premium price.

Plaintiffs suggest that the defendants' sale of their stock at a premium was a sale of a corporate asset belonging to all of the shareholders.

The much debated case of *Perlman v. Feldmann,* 219 F.2d 173 (2d Cir. 1955), cert. denied 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277, first established the rule that where a dominant stockholder sells his stock for a price higher than fair market value, and the premium is essentially payment for a corporate asset, the premium should be shared by the minority shareholders. In that case it was clearly established that what the purchasers desired was control over steel, the product of the seller's corporation, during

the Korean War, a time when steel was in scarce supply. The court specifically spoke of the situation as one where, because of market shortage, the company's product could command a considerable profit and concluded that the majority stockholder and officer could not appropriate that asset by receiving payment for it in the form of a premium for his control stock.

In the present case, the only corporate asset the plaintiffs point to is "the opportunity to sell fifty-two percent (52%) of the outstanding stock . . . ." Plaintiffs cite no authority, however, that such an opportunity is a corporate asset. In *Haberman v. Murchison,* supra, the same court that decided *Perlman* stated:

". . . [W]e are aware of no authority for the proposition that an offer to buy shares from a stockholder is either material inside information or a corporate asset. . . ." (468 F.2d at 1317.)

Some commentators have expressed views supportive of the result desired by plaintiffs. See Berle, "The Price of Power: Sale of Corporate Control," 50 Cornell L.Q. 628 (1965), which advances the view that when a majority stockholder receives an amount over investment value for his shares, he is receiving a premium for control, and control is a corporate asset. See also, Andrews, "The Stockholder's Right to Equal Opportunity in the Sale of Shares," 78 Harvard L. Rev. 505 (1965), arguing that every shareholder is entitled to an equal opportunity on a pro rata basis to sell shares on the same terms as a majority shareholder.

These theories have yet to find judicial support except implicitly in *Brown v. Halbert,* 271 Cal. App.2d 252, 76 Cal. Rptr. 781 (1969). In that case, the majority shareholder of a savings and loan association, who was also its president, received an inquiry as to whether the association was for sale. He replied that it was not but offered to sell his controlling stock. An agreement was reached to the effect that the defendant was to give the purchaser access to the association's books, that all directors and officers were to resign, and that no dividends were to be paid. The defendant received some $1,500 per share for his stock and then actively assisted the purchaser in procuring more shares from minority holders at $300 per share, often by statements to the effect that dividends would no longer be paid. The effect was a devaluation of the minority stock. The court found a breach of fiduciary duty and promulgated a rule that when a majority shareholder is to receive a premium for the sale of his stock, he

must show that no advantage was taken if the sale is questioned. Specifically, the court held that full disclosure must be made of an offer of purchase in such a situation.

Although we do not follow the requirement of disclosure as set forth in *Brown,* we do note that the facts of that case would with but little doubt be deemed a breach of fiduciary duty under the laws of this state. Here, we do not have a situation where the majority interests have in any manner sought to interfere with the rights of the minority. There was no attempt by the defendants after the sale to procure the holdings of the minority interests. The tender offer by Hentzen and Lawrence was at a fair price and was not aided by any coercive acts of the defendants. The facts in *Brown* simply are not applicable in this instance.

We hold that the defendants' sale of bank stock, which collectively amounted to the controlling interest in the bank, was not the sale of a corporate asset.

Finally, plaintiffs argue that the trial court failed to consider uncontroverted facts in reaching its findings and conclusions, and they list seven statements which they believe to be in that category. An examination of plaintiffs' suggested facts indicates to this court that the trial judge most certainly must have considered all of the evidence from which he might have made such findings. Furthermore, it does not appear that the suggested findings were necessary for a final determination of the issues in this case or, if they had been made, that they would have resulted in a different conclusion.

Having reached the conclusions herein expressed, there is no need to determine whether there was error in denying the maintenance of this case as a class action.

Judgment affirmed.